## O'REILLY et al. v. CITY OF CAMBRIDGE.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1922.)

No. 3586.

1. **Municipal corporations** ⬅➙368—**Omission from formal contract of requirement of proposais for maintenance bond held not to defeat requirement.**

Where the proposals by a city for bids for waterworks construction specified that before the final payment was made under the contract the contractor should give a bond for maintenance for a specified period in the future, the omission from the contract for the performance of the work of the requirement for such bond does not dispense with the necessity of giving it.

2. **Municipal corporations** ⬅➙374(2)—**Contractor's failure to give maintenance bond held not to render contract unenforceable.**

Where a municipal contract required the contractor, on completion of the contract and before the final estimate had been paid, to give a bond for maintenance of the work, and the city had never made a final estimate because of claimed defects in the contractor's work, so that the time for executing the bond had not arrived, the failure to give such bond would not prevent recovery on the contract by the contractor, but he can be required to give it as a condition precedent to judgment for any amount due him under the contract, which judgment would be treated as the final payment.

3. **Municipal corporations** ⬅➙336(1)—**Inclusion in contract of item not bid on held not to invalidate contract.**

Where a city asked bids on numerous items of various classes of work, reserving the right to waive defects in the bids, the inclusion in a contract with one who had bid on the laying of iron pipe, but not on the laying of wooden pipe, which was to be part of the same line, of a provision for the laying of the wooden pipe at a cost equal to the lowest bid on that item, did not violate Gen. Code Ohio, § 4328, requiring the contract to be made with the lowest and best bidder.

4. **Municipal corporations** ⬅➙374(2)—**Required approval of engineer is essential to recovery, unless waived or arbitrarily refused.**

Where the ultimate liability on a public improvement contract is made dependent on the approval of the engineer in charge or on his certificate or final estimate, the contractor cannot recover without such approval or certificate, unless he shows a waiver of the requirements, or that he was entitled to the certificate, and it was arbitrarily refused.

5. **Municipal corporations** ⬅➙374(6)—**Whether engineer had arbitrarily refused approval held question for jury.**

In an action by a city contractor to recover the final payment on the contract, where there was evidence tending to show that after the contractor made some changes, which the engineer required to be made there was no reasonable cause for dissatisfaction with any work for which the contractor was responsible, and that the engineer's refusal to give final approval was due either to a mistaken belief he could not approve, unless the service director approved, or else to an effort to shift to the service director his responsibility, a verdict for the city could not be directed, on the ground that the final approval of the engineer had not been given.

6. **Municipal corporations** ⬅➙360(1)—**Excavation of top soil held not included in clearing reservoir site.**

Where the specifications for the construction of a reservoir required the whole area to be cleared of trees, stumps, and bushes, by cutting them even with the ground and removing or burning them, and that the price bid should include all such removal, and that the sides of the reservoir between high and low water lines should be cleaned of all vegetation and

---

⬅➙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

top soil, a bid for cleaning and grubbing the reservoir site at a stated sum per acre did not include the removal of the top soil between the high and low water lines, but that was included under the item for extra excavation, to be paid for by the cubic yard, in view of the fact that the excavation at the price bid per cubic yard would be approximately $4,000 an acre, whereas the bid for clearing and grubbing was only $35 an acre.

**7. Appeal and error ⊚⇒919—Allegations of stricken pleading must be assumed to be true.**

In determining whether it was error to strike out a paragraph of the petition, the allegations of such paragraph must be taken as true.

**8. Municipal corporations ⊚⇒356—Removal of loose rock held part of preparation of foundation.**

Under specifications for reservoir construction which, under the heading "Preparing the Foundation of the Dam," required large stones or boulders to be removed, a bid for foundation excavation includes the work of removing loose rock in the foundation site.

**9. Municipal corporations ⊚⇒360(1)—Excavation exceeding estimate held not extra excavation.**

Where the proposals for bids for a contract expressly stated the estimates therein were only for the purpose of comparing bids, a contractor who bid a stated amount for excavation of the foundation for a dam and a higher sum for extra excavation is not entitled to pay at the rate bid for extra excavation for the excavation in the dam foundation exceeding the amount of the estimate, where there was other work required by the contract to which the bid for extra excavation applied.

**10. Contracts ⊚⇒213(2)—Undated contract speaks from its delivery.**

Where the written construction contract contained no date, a provision therein for completion within one year from its date must refer to the time of delivery.

**11. Municipal corporations ⊚⇒360(1)—Stripping top soil held included in bid for labor for earth fill.**

A bid by contractors to furnish labor for earth fill with teams fairly implies that they must load and haul the material, which was to be furnished by the city, and such loading included the stripping of the surface of the pit provided by the city, where no deep or difficult stripping was called for, so that the contractors were not entitled to pay for such stripping as extra excavation.

In Error to the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Action by Charles P. O'Reilly and others against the City of Cambridge. From a judgment dismissing the action at the conclusion of the trial before a jury, plaintiff brings error. Reversed and remanded for a new trial.

The city of Cambridge, Ohio, decided to make additions to and improvements in its waterworks system. Accordingly it prepared specifications and plans covering what was proposed, and advertised for bids thereon. According to the notice and plans the proposed work was divided into eight classes, four of which were: "Reinforcing existing system," "main storage reservoir," "pipe line to and from main reservoir," and "general items." Each class was subdivided into several items. Bidders were instructed that all bids must be upon a proper printed form, and these forms set out separately all the items of all classes—a total of 90 or 100 items. Bidders were further told that prices should be entered in the bidding blanks for each of the items. Among these instructions to contractors, printed upon the same paper which contained the preliminary estimate of quantities and the form for the proposal and the specifications and the form of a contract, were the following:

"7. The service director reserves the right to reject any and all bids, or waive defects in bids in the interest of the city, and to award the work as

a whole, or in part and by separate contracts; also to adjust the extent of the work to the amount of the appropriation."

"10. Upon the complete execution of the contract and before the final estimate has been paid, the contractors will be required to furnish a good and sufficient guaranty and maintenance bond covering the satisfactory and efficient operation of the machinery and appurtenances for a period of one year and the workmanship and materials on the other portions of the project for a period of five years."

Among the bidders was O'Reilly. He signed a printed proposal blank form covering all the items of all the classes, but he filled out bidding prices opposite only some of the items in each of the four classes above specified, save that, as to the main storage reservoir, he bid upon every item. His bid for the pipe lines to and from the main reservoir was upon three items only, and no bidding figures were entered opposite the item "for trenching and laying 24-inch wood pipe per foot." His bid and others upon the various parts of the work were received and canvassed, and it was determined to award him the contract for the items on which he had bid, while other portions were awarded to other bidders. In the formal contract, duly executed by both parties and made upon a similar blank, figures were inserted opposite the wood pipe item, and the contract included this item, which, according to the preliminary estimate, would have been about $5,000. The total contract, according to the estimates of quantities, would have been more than $100,000.

Payments were to be made in monthly installments upon the engineer's estimates, and 20 per cent. of the estimate was to be retained "until the complete execution and acceptance of the contract, and then to be paid to the contractors in connection with the final estimate." The contractor agreed to complete the work "in accordance with the attached proposal and specifications," and under the supervision and "to the satisfaction and acceptance of the engineer authorized to represent the director of public service." The specifications, which were expressly said to be a part of the attached contract, contained the following specific provisions:

"Whenever the word 'engineer' is used in these specifications, or in the contract attached, it shall be held to mean the W. J. Sherman Company, consulting engineers, or any authorized assistant appointed by them."

"Inspectors will be appointed, whose duty it will be to point out to the contractor any neglect or disregard of the specifications, but the right of final acceptance of the work by the city shall not be waived in any respect by reason of any action on the part of such inspectors."

O'Reilly entered upon the work, and after some delays and changes had substantially completed the work, and had received 80 per cent. of the agreed price, when controversy arose. Eventually this action was brought to recover for the retained percentages and for extra work. The city in defense pleaded that the bond specified in the instructions to bidders had never been given and that the work was not in accordance with the contract, and counterclaimed for large damages on account of defective work. Upon the trial before the jury it developed for the first time that the wooden pipe item included in the contract had not been included in the bid; the objection not having been made in the answer. At the conclusion of the trial, defendant made a motion for directed verdict, and the court dismissed the action for the two reasons that the bond had not been given and that the whole contract was invalid on account of the inclusion of the wooden pipe item. The plaintiff complains of each of these conclusions as erroneous, and also asks that, if a new trial is ordered, the rulings of the court should be reviewed in several matters which arose during the trial and which will arise again.

Jas. R. Kinealy, of St. Louis, Mo. (James Joyce, of Cambridge, Ohio, and Kinealy & Kinealy, of St. Louis, Mo., on the brief), for plaintiffs in error.

Chas. S. Sheppard, of Cambridge, Ohio (Wm. H. Brown, of Cambridge, Ohio, on the brief), for defendant in error.

DENISON, Circuit Judge (after stating the facts as above).    [1]
As to the maintenance bond, we must determine whether it was neces-
sary and what effect follows its absence.  We have no doubt of its ne-
cessity.  Its requirement was not so far a part of the subject-matter
of the contract that the failure to include a call for it in the formal
written contract would eliminate it, either because it was a part of the
preliminary negotiations which were merged into the contract or be-
cause it varied or modified the contract.   The obligations of the con-
tract to be performed began with the commencement of the work and
ended with the finishing of the work and the payment therefor, and
the construction bond which the contract provides for is incidental to
and secures the completion of the work.   The guaranty and mainte-
nance bond looked to a future period.   Such retention of a percentage
as the printed form of the contract provides for, beyond the completion
of the contract, for the purpose of securing maintenance, refers to a
part of the work not let to this contractor.   By the original notice it
was expressly provided that upon the completion of the work the con-
tractor should give—as to this work—a guaranty and maintenance
bond for five years.  This condition was a part of the same paper which
contained O'Reilly's bid and the specifications and the blank contract.
By such bid, O'Reilly accepted this condition.   All of the bidders did
the same.   The giving of such bond would be a distinct burden on the
bidder and a benefit to the city.   Since the subsequently executed con-
tract constituted no waiver of this condition, we must conclude that
its acceptance created a valid and continuing contract between the par-
ties.

[2] It does not follow that the contract is unenforceable.  The con-
ditions called only for the giving of the bond after the contract was
completely executed by the contractor and before the final estimate was
paid, and then only if the city required it.  The applicability of the pro-
vision to such "workmanship" as was involved in plaintiffs' contract
might well be so doubtful as to leave the final requirement optional
with the city.  Up to the time of commencing this suit there had been
no such requirement.  On the other hand, the city and the engineer had
declined to make the final estimate, and the time when the bond could
be demanded had not been reached.  The city could not consistently
have accepted such a bond if it had been tendered, and the tender was
plainly not necessary until the point of payment was reached.   We
think, however, that, in order to carry out the substance of the agree-
ment on this subject, the proceedings in this case should be so shaped
that the substantial benefit and security of the bond will be preserved
to the city.  The judgment in this case, if eventually rendered for the
plaintiffs, will be upon the theory that the city had waived the final
estimate and the formal general acceptance by and satisfaction of the
engineer.  In that situation the plaintiffs should have pleaded their
willingness to give the required bond in connection with the case and
before the rendering of any judgment therein.  The sufficiency of any
bond which is offered can be determined by the court, as can likewise
the precise time and manner of its production in order to insure that
payment shall not be compelled until the bond is given.  Plaintiffs

should amend their pleadings in order to cover such a proffer. The verdict of the jury, if for the plaintiffs, will stand for the engineer's estimate. The judgment will stand for payment. The bond will appropriately be an intermediate condition. Since the contemplated five-year period will probably have expired before the further trial, and since the question whether the workmanship and materials were in accord with the contract, will be decided by the jury upon such trial, it does not seem that the furnishing of the bond will turn out to be very important.

[3] The evidence as to how the wooden pipe item came to be included in the contract, when O'Reilly had not bid upon it, is very incomplete. Since the case was dismissed upon this ground, and this action was analogous, though not necessarily equivalent, to directing a verdict for the defendant, we must take the tendency of the evidence most strongly in plaintiffs' favor, and assume any state of fact which might fairly be inferred from the evidence and which would tend to support plaintiffs' right of action. Giving to the city officials the ordinary presumption of good faith, it is quite consistent with the evidence and is probable enough, as such things go, and we therefore for the purpose of this opinion may rightly assume, that O'Reilly was the lowest bidder upon the items named in his bid, after giving due regard to the quantity estimates, that other bidders were the lowest upon many other parts of the work, that no bid upon the wooden pipe item was at a lower price than that for which it was awarded to O'Reilly, and that the city, in effect, said to O'Reilly:

"You have the best bid upon the reservoir work and the iron pipe to and from, but it would be for the advantage of the city to have you lay also the wooden pipe, which is a part of the same class of work, rather than to make a separate job of it by some one else, and if you will do that work at the lowest price which has been bid for it, we will add that item to your contract,"

—and that O'Reilly accepted this proposition. Of course, the evidence upon the new trial may develop the situation differently in some material particular than that which we thus assume; but this cannot be now foreseen.

We find no satisfactory reason for thinking that the wooden pipe item of the contract would be invalid under the circumstances so to be assumed. The statute involved is section 4328 of the Ohio General Code, reading as follows:

" * * * The director of public service shall make a written contract with the lowest and best bidder after advertisement for not less than two or more than four consecutive weeks in a newspaper of general circulation within the city."

One well-known purpose of such a provision is to prevent favoritism among those seeking public contracts. It is at once obvious that the decisions which have reference to the awarding of a unitary contract for one matter, and some of the principles involved in such decisions, have no application to a case where it was contemplated from the beginning that the contract would be awarded in fractions according to discretionary grouping of the fractional bids. Under such circum-

stances the right of the director to reject any and all bids gave him the right to accept part and reject part of one bid, provided that it did not result in the separation of items which were in fact rather necessarily associated. For example, under the class of work headed "Reinforcing Existing System," O'Reilly did not bid at all for the pipes, hydrants, and valves which would be necessary, but did bid different prices for trenching and laying the specified, but varying, sizes of pipe, and did bid different prices for installing the different sizes of valves. It seems clear that, unless something which is not apparent on the face of the bid would have made it unjust, the contract for laying the 10-inch pipe might have been given to O'Reilly under his bid, and the contract for laying the 14-inch pipe might have been given to some other bidder who was lower. As it turned out, O'Reilly was awarded a complete contract for all the items included under the class "Main Storage Reservoir."

Under the class "Pipe Line to and from Main Reservoir," he did not bid upon furnishing either iron or wooden pipe or gates and fittings, but did bid upon, and seems to have been entitled to, the contract for the work of laying the iron pipe. The plans and specifications required that the outlet pipe and conduit from the reservoir to the filter plant and pumping station should be of iron pipe for part of the way and optionally of wooden pipe for the remainder. It is clear enough that it would very likely be for the interest of the city to have this entire conduit laid by one contractor rather than part of it by another one who was doing no work in the vicinity. If some other contractor had bid upon all of the items in this class, including the wooden pipe, but upon everything else O'Reilly's bid was lower, this other contractor could probably not be compelled to take the contract upon his bid for the wooden pipe alone. We see in such a situation no opportunity for favoritism or unfair dealing or prejudice to the city. If the successful bidder upon most of the items is awarded the contract upon condition that he will assume also an item upon which he did not bid, and will do so at a price such that the city cannot be prejudiced, every requirement intended for the safety of the city has been met and fulfilled by the public advertisement and by the reception and consideration of all the bids made. Any theoretical possibility that there might be favoritism is rendered negligible in the case which we have assumed we may infer from the proofs in this case by the fact that the added item is so relatively small. No intent to give O'Reilly an advantage by evading the bidding law can be found in the supposed facts.

We find no decision of the Ohio Supreme Court which requires any other conclusion. Chief reliance has been placed upon the decision of that court in Beaver v. Trustees, 19 Ohio St. 97. There a contract was to be awarded by public trustees under a statute which required it to be given to the person offering the lowest price upon sealed proposals made after six weeks' public notice. The advertisement for the proposals was made in connection with printed bidding forms which in the class of carpenter work included, for example, "interior principal room doors and trimmings," and in the class of hardware included door hinges. When the bids were opened it appeared that Beaver as

a contractor had bid upon "doors and trimmings," and also had bid upon the door hinges under the heading "Hardware," while Griffith as a contractor had carefully stated that in his bid for doors and trimmings he did not include the hardware for doors. Griffith's total bid was lower than Beaver's. The trustees, finding that there had been a misunderstanding, returned all the bids, and requested that new bids be filed, corrected in this respect, within one week. Beaver filed a new bid, stating that his first bid was based upon erroneously including the hinges twice, and on that account making a deduction of about $2,000, whereby his bid became lower than Griffith's. Griffith stated that he had no correction to make in this respect and stood upon his original bid. The decision of the Ohio Supreme Court was that under these circumstances it would mandamus the trustees requiring that the contract be awarded to Griffith.

The situation was plainly and vitally different from that which we have supposed here existed. If O'Reilly's bid had been high and had been transmuted into the low bid by the shifting done after the bids were opened, we would have a parallel case. Nor do we think the syllabus should be treated as creating a rule of law far broader than anything called for by the facts. We say so, both because of the familiar rule in Ohio that the syllabus is to be read in view of the facts,[1] and because, even on the face of the syllabus, it does not reach the present supposed case. The first paragraph declares that under this statute, which imperatively requires letting to the lowest bidder, it is the absolute duty of the public trustees to award the contract to the lowest bidder upon the opening of the sealed proposals. The statute now here involved calls for awarding the contract to the lowest and best bidder, expressly contemplating that other circumstances than the mere size of the figure named may rightfully be taken into consideration in deciding which bid is best for the interest of the city.[2] The second paragraph of the syllabus declares that in such case the public trustees have no discretion to permit an alteration or amendment to any proposal. This paragraph also depends in part upon the imperative requirement of the statute that the contract be awarded to the lowest bidder. Both paragraphs were formulated with reference to the duty to award the contract when the bids were opened rather than to permit anybody to make new bids after the amounts had become public, and with reference also to changes in the items of a bid for one entire contract rather than with reference to items which were expected to be awarded and which were awarded in fractional contracts. If we turn from the syllabus to the general discussion and reasoning found in the opinion, it is clear that, save for general and undisputed principles, it has no application to a case like the present one.

The decision in Boren v. Commissioners, 21 Ohio St. 311, is equally far from controlling. In that case the commissioners advertised for bids for furnishing all the materials excepting brick, and for all the

[1] In re Poage, 87 Ohio St. 72, 82, 83, 100 N. E. 125.
[2] See notes to section 4238, in Page & Adams' Annotated Code, for numerous Ohio cases recognizing a wide discretion in the director.

labor excepting excavation, for building a court house. Bids were received, each in a single aggregate sum, for the whole contract. The highest bidder did not bid in the form of the solicited proposals, but bid for all the materials and all the work. After the bids were opened he demanded the contract on the ground that, if his bid were reduced by the reasonable cost of brick and excavation, his bid would become the lowest. This revision of the bid was not permitted. Whatever the opinion says about the necessity of strict adherence to the bids is said with reference to an attempt to reduce by outside and uncertain evidence the gross amount of a single bid. It can have no application to a case of unit bids on separate items. The third paragraph of the syllabus, which is the only one applicable by its general language, expressly confines the holding to a case where the price proposed was an aggregate sum for the whole.

By the preliminary notice to contractors in the present case, it was specified that the director of public service might "waive irregularities in bids," and in the above-quoted paragraph of instructions to contractors it is said that the service director may "waive defects in bids in the interest of the city." It is not necessary to determine what effect these provisions have upon the action of the director in permitting the proposal to be somewhat modified. In so far as they are not inconsistent with the statute, their tendency is to support such action.

We observe also that under the General Code, § 4331,[8] it seemingly was within the power of the service director to contract with O'Reilly upon the basis of O'Reilly's bid without modification, and a few days later, without any further bidding, to make a supplementary contract covering the wooden pipe line as an incidental addition to the main body of the work. It is not easy to see what vital principle is violated by permitting this to be done by the original contract instead of by a supplemental one. The approval of the board of control required by section 4331 is equally necessary to an original contract, like the one in suit (section 4403) and presumably was here given.

[4] The city claims that any error by the trial court in the effect given to the presence of the wooden pipe item in the contract is immaterial, because the defendant was entitled to a directed verdict on account of the absence of any final acceptance by the engineer. It is the familiar rule in this class of contracts that, where the ultimate liability is made dependent upon the approval of the engineer in charge, or his certificate, or his final estimate, the contractor cannot recover in its absence, unless he shows a waiver of the requirements, or that he was entitled to this certificate, and that it was arbitrarily refused. Stark Co. v. McGinty Co. (C. C. A. 6) 238 Fed. 657, 665, 666, 151 C. C. A. 507, and cases cited.

---

[8] "When it becomes necessary in the opinion of the director of public service, in the prosecution of any work or improvement under contract, to make alterations or modifications in such contract, such alterations or modifications shall only be made upon the order of such director, but such order shall be of no effect until the price to be paid for the work and material, or both, under the altered or modified contract, has been agreed upon in writing and signed by the contractor and the director on behalf of the corporation, and approved by the board of control, as provided by law."

[5] This contract does not provide that the decision of the engineer shall be conclusive, except so far as that result is implied by the call for "satisfaction." It distinguishes between the engineer, with his assistants, who represent him, and the inspectors, who represent the city. The present approval or passing by an inspector would not stand in the place of the final approval by the engineer; but we find no provision which would justify a final failure to approve by the engineer, where there was no ground for his action, excepting alleged defects in the work which at the time, with full knowledge of everything involved, had been inspected and passed as satisfactory by him or by his assistants. The contract does not give to the engineer the right to change his mind arbitrarily after he has once acted. In the present record there is evidence tending to show that, after making some changes which the engineer finally required, there was nothing remaining upon which he could reasonably base any claim of dissatisfaction, save as to the leaks in the wooden pipe. There is also evidence tending to show that these leaks were not the result of defective workmanship in laying, but were due to faults in the pipe which O'Reilly did not furnish, and also tending to show that the engineer's refusal to give final approval was due either to a mistaken belief that he could not do so unless the service director approved, or else to an effort to shift to the service director the responsibility for the decision which the engineer was required to make. There is evidence to the contrary in all these respects; but the decision was for the jury, and it would have been error to direct a verdict for the defendant upon this ground.

[6] Before the trial, the court had stricken out paragraph 18 of the petition, because it did not show a right of recovery; and this is said to be error. The reservoir was to consist of a dam at one end, the two steep parallel opposite hillsides, and the upstream extension of these hillsides, submerged to a gradually lessening depth. The specifications under the class heading "Reservoir and Dam," and the subtitle, "Clearing and Grubbing," said:

"The whole area of the reservoir shall be cleared by cutting all trees, stumps, and bushes even with the ground, and removing or burning the same, together with all débris. * * * The price bid for this work shall include all such removal. The sides of the reservoir, down to a point where the depth of water thereon at high water will be less than 5 feet, shall be cleaned of all vegetation and top soil."

The proposal blanks, under this same class heading, contained an item "Clearing and grubbing reservoir site per acre," upon which item plaintiffs bid $35. This blank contained no item referring to any excavation (except for the dam foundation) in connection with the reservoir; but under the class heading, "General Items," there was an item, "For extra excavation per cubic yard," and plaintiffs bid opposite this item 75 cents. Both of these bid items, in the same form, were carried into the contract. The eighteenth paragraph of the petition claimed recovery at 75 cents per yard for 3,600 cubic yards as extra excavation in removing top earth, which the engineer deemed necessary to have removed along the high-water mark to prepare the reservoir in accordance with the plans and specifications. It is plain enough that

any work which was required by the plans and specifications would not be "extra" under the ordinary definition; but this term "extra excavation" must be here defined as the parties intended to use it. The contract, we assume, required this work to be done; but it provided no price therefor, unless the work was "extra excavation" at 75 cents per cubic yard, or unless it was "clearing and grubbing" at $35 per acre. The latter construction is much more unreasonable and improbable than the former. The provision which we have quoted, requiring cleaning "of all vegetation and top soil," is very blind as to the area which it intended to reach; but all parties seem now to assume that it had reference to the strip of reservoir side hill area between high and low water marks which might be alternately wet and dry, extending from the point covered at high water mark to the point covered when the water was 5 feet lower.

As it turned out, this was a substantial item. If the top soil removed was one yard deep, the area cleaned would be less than one acre, and the cost per acre, at 75 cents per cubic yard would be approximately $4,000. Any intention to include this work in the price of $35 per acre would be against all reasonable inference. The amount of top soil to be removed was not named in the estimates, and if it was too uncertain to be estimated it was too uncertain to be bid for, except at a per yard price. The statement in the specifications that the price bid for the per acre clearing "shall include all such removal" refers only to the things which had been named, and not to that cleaning off top soil which was thereafter named. Considering all the elements, we cannot doubt that the mere reference to this work under the heading "Cleaning and Grubbing" does not operate to make it a part of that cleaning and grubbing which was to be bid for at a per acre price. On the contrary it was "excavation," and since the contract was intended to fix prices for everything which it required, and no price is fixed for this excavation, unless it was "extra," it must be so classified.

[7, 8] The court also struck out paragraph 20 of the petition, and in determining whether this was error the allegations must be taken as true. This paragraph claims that plaintiffs are entitled to have their compensation computed at the rate specified in the contract for "extra labor" and "team labor," and with reference to loose rock removed in preparing foundation for the dam, instead of computing the same at the contract rate for "foundation excavation" at this point. The question therefore is one of proper construction for this last phrase. If it included the loose rock to which paragraph 20 refers, plaintiffs must be satisfied with the 60 cents per cubic yard which has been allowed. Otherwise the loose rock removal must be considered as extra labor and team work, because there is no other item of the bid to which it can be assigned. When we look at the specifications for the work at the reservoir and dam, we find that under the heading "Preparing the Foundation of the Dam," it is said:

"The surface soil shall be removed from the entire site of the embankment to a depth sufficient to reach good sound material. * * * Such excavation shall be paid for by the cubic yard at prices bid for excavation. All large stones or boulders shall be removed."

In the preliminary estimates we find the item, "Stripping dam site, 800 cubic yards." Plaintiffs seem to be right in claiming that the removal of this loose rock is not "foundation excavation," unless such rock was a part of the surface soil, because the language used does not contemplate in this item the excavation of anything but surface soil; but there is no reason why the "loose rock" of paragraph 20 should not be thought to be of the class which includes all large stones or boulders above the solid foundation, and which the specifications evidently considered as a part of the surface soil in which they are found. In this respect the loose rock of paragraph 20 may differ materially from the more solid rock which it might turn out must be removed, but which could not be called surface soil, and for which the city might have allowed extra compensation—as it did—without implying any obligation to do so as to the loose rock of this paragraph. We find no error in the action of the trial court in this particular.

[9] By paragraph 26 the petition claimed that excavation of surface soil made in completing the "foundation excavation" was "extra excavation" by so much as it exceeded the preliminary estimate. These estimates were expressly said to be only for the purpose of comparing bids. Plainly, excavation in excess of such an estimate cannot be said to be "extra," calling for extra pay, unless there was nothing else likely to develop under the contract to which an "extra excavation" price would apply. In discussing paragraph 18 we have pointed out that there was other apt application.

[10] Since the written contract contained no date, the blank therefor not being filled, a provision for completion within one year from its date must refer to the time of delivery.

[11] Plaintiffs did not bid upon material for the dam, but only on labor for "earth fill with teams." They were not obliged to furnish the material, but the fair implication is that they must load and haul, and they agreed that the material should be selected, "subject to the approval of the engineer." Such loading, in the quantities here involved, naturally included the rejection and removal of unfit material, as far as necessary to get at the approved material, and to the extent ordinarily incidental to such an operation. Hence plaintiffs are not entitled to "extra excavation" pay for surface stripping of the borrow pit provided by the city. It was not said to have called for unusually deep or difficult stripping. It was intended to be compensated by the per yard price of the earth moved.

Upon the three points last mentioned, there was no error. For the reasons stated as to other points, the judgment must be reversed, with costs, and the case remanded for a new trial.