## John F. Kennedy *vs.* City of Boston.

Suffolk.    October 6, 1933. — March 29, 1934.

Present: Rugg, C.J., Crosby, Pierce, Donahue, & Lummus, JJ.

*Contract*, Construction, Cancellation, Building contract.  *Equity Juris-diction*, Mistake.

A substantial portion of the work to be done under a contract between a contractor and a city for the construction of a sewer was the excavation of rock, for which the contractor was to be paid a certain sum per cubic yard.  In taking bids, the city had stated to the contractor and to the other bidders that approximately a certain amount of rock was to be excavated, and had furnished to them the data upon which that amount had been estimated by the city's representatives, but also stated that such amount was assumed only for the purpose of comparing bids and that the city did not "agree that the actual amount of work will even approximately .correspond therewith."  The contractor made his bid on the entire contract on the assumption that such estimate was substantially correct.  He made no request for leave to make his own borings or to dig test pits, believing that leave would not be given to do so, it having been refused on a previous similar occasion.  The contract provided that the contractor had made his bid "from his own examinations and estimates" and should not hold the city responsible for any estimate or data; that the amount of excavation mentioned was merely an estimate; that a representative of the city should decide which of the materials in the locus of the work was to be classified as rock within the meaning of the contract; that the contractor should have no claim for labor or materials other than for the "unit prices" stated and should have no claim for consequential damages "by reason of any increase or diminution of the quantities assumed solely as a basis for the comparison of proposals"; and. that, in general, the contractor should take all risks arising in the work of excavation.  When the contractor had partially performed the contract, it was discovered that the quantity of rock to be excavated was only a small fraction of the quantity estimated.  In a suit in equity by the contractor against the city to cancel the contract on the ground of mutual mistake as to the quantity of rock, it was *held*, that

(1) The contract was not made upon the basis that there was a definite amount of rock to be excavated; under the contract, the amount was to be determined as the work progressed;

(2) The plaintiff relied at his own risk upon the estimated amount stated by the city to the bidders;

(3) The plaintiff was not aided by the circumstance that he understood from his experience on a previous similar occasion that he would not be permitted to make his own borings or to dig test pits; he nevertheless should have requested permission;

(4) There was no mutual mistake such as to require the cancellation of the contract;

(5) The suit could not be maintained.

BILL IN EQUITY, filed in the Superior Court on November 2, 1932, for cancellation of a contract between the plaintiff and the defendant for the construction of a sewer on the ground that the contract was made under a mutual mistake of the parties as to the quantity of rock to be excavated.

The suit was referred to a master. Material facts are stated in the opinion. By order of *O'Connell*, J., there were entered an interlocutory decree confirming the master's report and a final decree cancelling the contract. The defendant appealed.

*H. M. Pakulski*, Assistant Corporation Counsel, (*C. H. McCue*, Assistant Corporation Counsel, with him,) for the defendant.

*J. J. Donahue*, for the plaintiff.

CROSBY, J. This is a bill in equity brought by the plaintiff to cancel a contract for the construction of a sewer for the city of Boston. The case was heard upon a master's report and a decree was entered cancelling the contract. The case is before this court upon the defendant's appeal from the decree.

Pending the hearings before the master, the parties agreed upon the facts and the evidence, and in accordance with the agreement the master found as follows: The plaintiff is, and has been for several years, a general contractor. The defendant is a municipal corporation. "On the 30th day of April, 1932, a notice to bidders was issued by the commissioner of public works of the city of Boston inviting bids for the construction of sewerage works in Maywoods Brook in Laurel and Ottawa Streets from Dale to Sherman Streets, Roxbury, and the notice to bidders was contained in a pamphlet of seventy-five pages produced in evidence as Exhibit 1, which pamphlet also contained a proposal, and

a contract." The work to be done consisted of thirty-nine items variously numbered from 1 to 62, and the proposal called upon bidders to give prices per linear foot for laying sewer pipe of various diameters, said price to cover the cost of excavating the trench in which the pipe was laid, as well as the cost of refilling the trench, and of incidental work. In each item of the proposal the city fixed a figure showing the quantity of work to be done, and twenty-two items called upon bidders to furnish a price per unit of the quantity fixed by the city in the proposal. There were seventeen items in the proposal where the city stated the quantity, and also set or fixed the price per unit that it would pay. The proposal on page 6 contained these words: "Bidders will insert prices only for the items for which prices have not been fixed by the City." "Item 19 of said proposal stated: 'Rock excavation. . . . For 2500 cubic yards, more or less, of rock excavation, the sum of Seven Dollars ($7.00) per cubic yard,' and the amount of rock excavation, that is, two thousand five hundred cubic yards was the estimated quantity, and the price, that is, $7 per cubic yard, was estimated and fixed respectively by the city."

Bids for the work were opened on May 10, 1932, and it appeared that twenty contractors had submitted bids, and that the plaintiff's bid was the lowest. On May 12, 1932, a contract was signed between the plaintiff and the defendant for the construction of the work for the sum of $52,457. The price of the rock excavation was fixed by the city at $7 per cubic yard, and it was estimated that there would be found approximately two thousand five hundred cubic yards of said rock excavation. If this estimate were in conformity to the facts, the amount to be paid for rock excavation would be $17,500, slightly in excess of thirty-three per cent of the $52,457, the total estimate for the whole work. The city had two sets of borings made to indicate the nature of the ground where the sewer was to be constructed. The borings indicated the presence of a ledge from five to fifteen feet below the surface of the street where the sewer was to be constructed. The engineers employed by the city considered the borings to be approximately correct, and

estimated that the borings showed the presence of about two thousand five hundred cubic yards of rock in the space to be excavated. The engineers employed by the city used the data on the borings to estimate the approximate cost of the sewerage works, and the city in good faith used such estimates, and submitted such data of estimates to all contractors to bid upon the work. The data obtained from the borings were graphically set out according to scale on plans submitted to all contractors. The plaintiff assumed the data concerning the borings were correct, and the statement of the quantity of rock contained in the proposal issued by the commissioner of public works to be substantially correct, and used both as a basis for his bid, and as the ground for making his contract. In submitting his bid he relied entirely upon these data, making no request prior thereto to make his own borings, or to dig test pits, understanding that such a request would not have been granted. The plaintiff had applied at the permit office of the street commissioner in March, 1931, for a permit to make borings before bidding on a sewer job and the clerk of the office told him that permits were never granted to contractors to open streets for such purposes. This application had no relation to the contract in issue in the present case. "The petitioner did not make any request to the board of street commissioners." The plaintiff commenced work and carried it on until almost half completed, and found only one hundred seventy-eight cubic yards of rock. On discovering that the amount of rock to be encountered would be considerably less than the estimated amount he at once submitted the matter to the commissioner of public works, and asked that the contract be cancelled. This was refused. Thereafter, the plaintiff, under orders from the city, dug test pits over the remaining portion of the work not yet completed to determine the nature of the ground, and whether or not any rock would be found within the limits of the work. The plaintiff then ceased to perform any further work under the contract, although called upon to do so by the defendant.

The quantity of rock was an important element in the

minds of both parties. The error in assuming the amount of rock to be found was not discovered until after the contract was executed, and the work had progressed to a considerable extent. The error in estimating the quantity of rock was unintentional, both parties were ignorant of any serious discrepancy between the amount of rock estimated and the amount actually present until after the excavation had commenced. The amount of rock stated in the proposal was accepted by the plaintiff as approximately correct and his bid was based thereon.

The proposal on page 5, Exhibit 1, provided as follows: "It is to be understood that the quantities given in the proposal are assumed solely as a basis for the comparison of proposals. The Commissioner does not expressly or by implication agree that the actual amount of work will even approximately correspond therewith, but reserves the right to increase or diminish the amount of any class or portion of the work as he may deem necessary, without change of price per unit of quantity."

The contract between the parties begins on page 25 of Exhibit 1, and provides that the plans and specifications annexed are made a part of the contract. On page 26 of Exhibit 1 appears the following: "ARTICLE 1. The Contractor has made his proposal from his own examinations and estimates, and shall not hold the City, its agents or employees, responsible for, or bound by, any schedule, estimate, sounding, boring or any plan of any thereof; . . . shall, subject to the provisions of the contract, take all responsibility of, and bear, all losses resulting to him in carrying on the contract . . . ." On pages 26 and 27, Exhibit 1, it is recited: "ARTICLE 2. The Contractor shall do the work and do it in the manner set forth in the specifications of the contract, except that the City, by order in writing of the Commissioner, from time to time given to the Contractor or his foreman, may change, increase or take away any part of the work, or change the specifications, plans, drawings, form or materials thereof, or require the Contractor to hasten the work or to furnish any extra materials or extra labor relating thereto, and the Contractor

shall conform to the orders. The quantities mentioned in the contract are merely estimates of what will probably be required, and the department reserves the right to increase or diminish the quantities in any of the items as it may deem necessary, without change of price per unit of quantity, provided that the increase or diminution of the sum of all of said items, as determined by the Engineer's final estimate, does not exceed 25 per cent of the total of the original proposal." The specifications of the contract as they appear on page 39 of Exhibit 1 contain the following: "SECTION 1. MANNER OF AND THINGS TO BE OBSERVED IN DOING THE WORK. — (*a.*) Carefully study these specifications, the plans for the work in the office of the Commissioner, and the orders that shall be made and given as authorized in Articles 2 and 3 of the contract, and procure from the Commissioner information relative to borings when taken, samples of which will be kept in the office of the Commissioner — special information as to any part of the work not fully shown by said specifications, plans or orders — detail drawings of such parts as detail drawings are to be provided for, and — directions as to the order and manner of doing the work. *The Contractor shall thoroughly examine the site of the work, consult plans on file in Room 706, City Hall Annex, and familiarize himself with all the sewers, surface drains, underdrains, tidegates, overflows, brooks, culverts, etc., which may directly or indirectly affect the progress of the work.* (*b.*) Carefully compare all said specifications, plans, orders and drawings, all figures, dimensions, lines, marks and scales thereof, and all directions of the Commissioner relating to the work, and conform to those in relation to which there shall be no doubt or discrepancy, but at once submit all cases of doubt or discrepancy to the Commissioner for adjustment . . . ." Pertinent provisions of the contract and the specifications of the contract not set out in the master's report are as follows: "ARTICLE 6. (*a.*) Subject to any provisions in the specifications to the contrary, the prices named in the portion of this pamphlet called the proposal shall be paid by the City and received by the Contractor

as full compensation for furnishing materials and use of tools, forms, machinery and other implements, and for labor in moving materials and executing all the work contemplated in the contract, also for all loss or damage arising out of the nature of the work aforesaid, or from the action of the elements, or from any unforeseen obstruction or difficulties which may be encountered in the prosecution of the same and for all risks of every description connected with the work; and for well and faithfully completing the work in the manner and according to the plans and specifications and the requirements of the Commissioner under them. (*b.*) The Contractor shall have no claim in respect of labor and materials, other than the amount based upon the unit prices given for the respective items in the proposal, nor for consequential damages, by reason of any increase or diminution of the quantities assumed solely as a basis for the comparison of proposals." Section 5 of the specifications of the contract, Exhibit 1, pages 52 and 53, provides in part: "ROCK EXCAVATION. — (*a.*) No soft, loose or broken rock, impacted boulders, or hardpan, but only such solid rock, as may be approved by the Commissioner in advance as requiring blasting for its removal, and boulders of one and one half (1½) cubic yards or more found in and removed from the excavation, are to be considered as rock excavation to be paid for at the price named under item of the proposal marked 'Rock excavation,' said price being understood as covering the extra cost of rock excavation over the prices named for earth excavation and refill; *nevertheless*, the Commissioner may pay to the Contractor such portion of said price as he may deem equitable for soft, loose or broken rock, or impacted boulders. . . . (*b.*) The decision of the Commissioner in regard to classification and payment is to be final and binding upon all parties, and it is to be distinctly understood that, except as decided by him in virtue of the provisions of this section and of those relating to 'Obstructions' (Section 6), no payment will be made for excavation and refill other than the inclusive prices named in the proposal for earth excavation and refill per linear foot of trench. The

intended effect of this stipulation is that, except as contemplated in these provisions, the Contractor shall bear all costs and take all risks, of whatever description, arising in the work of excavation, back-filling and the restoration of all surfaces interfered with, even though such costs and risks shall arise from hardpan, quicksands, silt or other difficulties not specifically within the scope of said provisions."

Three exhibits were introduced in evidence, namely: (1) the pamphlet of seventy-five pages containing the notice to bidders, proposal and contract hereinbefore referred to; (2) the plans of the work upon which the plaintiff based his bid; and (3) a canvass of the bid showing the amount paid by the plaintiff on each item, and the set prices made by the city on certain items. There was no evidence before the master relating to the terms of the contract other than that appearing in these three exhibits. The question for determination is whether there was any mutual mistake which requires the cancellation of the contract.

The contract was for the construction of certain sewerage works and involved a considerable amount of excavation. The case belongs to a class of cases where many uncertainties respecting conditions to be encountered exist and as to which the extent of labor to be performed or materials to be furnished cannot definitely be determined except as the work progresses. Although in cases of this kind parties may enter into a contract upon the basis of the existence of a definite amount of material which is to be excavated and removed, see *Long* v. *Athol*, 196 Mass. 497, they did not do so in the case at bar. Item 19 of the proposal stated, "Rock excavation. . . . For 2500 cubic yards, more or less, of rock excavation, the sum of Seven Dollars ($7.00) per cubic yard." It was estimated by the city engineers, from the borings, that there would be found approximately this quantity of rock in the ground to be excavated for the construction of the sewer. But the defendant did not enter into the contract upon the basis of the existence of twenty-five hundred cubic yards or any other quantity of rock. This quantity plainly was used solely as a basis to determine the price which the defendant would pay per cubic yard for rock excavation. The contract

expressly stated that the quantities given in the proposal were "assumed solely as a basis for the comparison of proposals." That the defendant did not contract for the excavation of a definite quantity of rock, but left that question to be determined as the work progressed is clear from other provisions. It was stated in the proposal that the commissioner did not "expressly or by implication agree that the actual amount of work will even approximately correspond therewith [the quantities given in the proposal], but reserves the right to increase or diminish the amount of any class or portion of the work as he may deem necessary, without change of price per unit of quantity." Furthermore, and conclusive on the question, § 5 of the specifications of the contract defines rock excavation. It provides that "No soft, loose or broken rock, impacted boulders, or hardpan, but only such solid rock, as may be approved by the Commissioner in advance as requiring blasting for its removal, and boulders of one and one half (1½) cubic yards or more found in and removed from the excavation, are to be considered as rock excavation to be paid for at the price named under item of the proposal marked 'Rock excavation,' said price being understood as covering the extra cost of rock excavation over. the prices named for earth excavation and refill . . . ." Section 5 (b) provides, in part, "The decision of the Commissioner in regard to classification and payment is to be final and binding upon all parties, and it is to be distinctly understood that, except as decided by him in virtue of the provisions of this section and of those relating to 'Obstructions' (Section 6), no payment will be made for excavation and refill other than the inclusive prices named in the proposal for earth excavation and refill per linear foot of trench." Manifestly, from the words "such solid rock, as may be approved by the Commissioner in advance as requiring blasting for its removal, and boulders of one and one half (1½) cubic yards or more found in and removed from the excavation" the contract looked to the future for the ascertainment of the quantity of rock which was to be excavated and paid for at the price named in the proposal. These are the determinative words of the contract. The ascertainment of the quan-

tity of rock awaited the decision of the commissioner. His
decision in regard to classification, whether the rock was of
such a nature as to require blasting for its removal and
whether the boulders found in and removed from the excava-
tion were in size one and one half cubic yards or more, could,
in the nature of things, only be made as the work progressed.
These provisions, to which the plaintiff agreed, are made a
part of the contract, and are fatal to his contention. Other
provisions show that the defendant did not enter into the
contract upon the basis of the existence of the quantity of
rock which the city engineers estimated from the borings
would be found in the excavation. Section 5 (b) of the
specifications was directed to the uncertainty of the con-
ditions to be encountered and placed the risk upon the plain-
tiff. It provided, in part, "The intended effect of this stipu-
lation is that, except as contemplated in these provisions,
the Contractor shall bear all costs and take all risks, of what-
ever description, arising in the work of excavation . . . even
though such costs and risks shall arise from hardpan, quick-
sands, silt or other difficulties not specifically within the scope
of said provisions." Besides, art. 6 (a) of the contract
provided, in part, "Subject to any provisions in the specifica-
tions to the contrary, the prices named in the portion of this
pamphlet called the proposal shall be paid by the City and
received by the Contractor as full compensation for . . . all
loss or damage arising out of the nature of the work aforesaid,
or from the action of the elements, or from any unforeseen
obstruction or difficulties which may be encountered in the
prosecution of the same and for all risks of every description
connected with the work . . . ." Art. 6 (b) provided, "The
Contractor shall have no claim in respect of labor and ma-
terials, other than the amount based upon the unit prices
given for the respective items in the proposal, nor for conse-
quential damages, by reason of any increase or diminution of
the quantities assumed solely as a basis for the comparison
of proposals." These provisions are natural in view of the
character of the work. Borings were made and the shortest
distance between them, as appears from the plans, was about
one hundred feet. When holes were bored about one hundred

feet apart it might seem to be impossible for the city to
determine what lay between them. See *Wells Brothers Co.*
v. *United States*, 254 U. S. 83; *Bates & Rogers Construction
Co.* v. *United States*, 56 Ct. of Cl. 49, 63.

Although the plaintiff was given the data on the borings,
yet the hazard of relying upon them was plainly recognized
by the parties, and the risk was assumed by the plaintiff by
art. 1 of the contract which provided that, "The Con-
tractor has made his proposal from his own examinations
and estimates, and shall not hold the City, its agents or em-
ployees, responsible for, or bound by, any schedule, esti-
mate, sounding, boring or any plan of any thereof . . . ."
The plaintiff made no request before submitting his bid to
make his own borings or to dig test pits, understanding from
what he was told by the clerk in the street commissioner's
office upon an application which he made in March, 1931,
in a case which had no relation to the contract in issue, that
such a request would not have been granted. This fact does
not aid the plaintiff. He should have made request in the
case at bar. The master found that the quantity of rock was
an important element in the minds of both parties. While
both assumed the presence of the quantity of rock given in
the proposal, the defendant assumed it not as an existing
quantity to be excavated at $7 per cubic yard, but solely
as a basis for the comparison of proposals. The plaintiff, on
the other hand, unwarrantably, assumed it as an existing
quantity to be excavated at the unit price fixed. It was
intended as an approximation. The case is governed in
principle by what was decided in *Young* v. *Holyoke*, 225
Mass. 140. In that case it was said at pages 143–144:
"While some of the estimates were grossly inadequate, the
defendant was ignorant of this fact, and it made no pretence
of knowing the exact amount of labor and material required
to complete the structure. . . . It was understood by the
plaintiff and the defendant that the rock surface, the depth
of the rock excavation and the character of the material were
not even approximately correct. The quantities of work to
be done were merely approximate. It was plainly stated
that there was no express or implied agreement 'that the

actual amount of work or material will correspond there-with.' The estimates were made solely as the basis for the uniform comparison of bids. The plaintiff knew this. . . . There was no mutual mistake such as to require the cancellation of the contract. The estimates were intended as approximations. This was known by defendant and plaintiff. There was no misunderstanding on this point." These statements are peculiarly pertinent to the facts in the case at bar. See *Rowe* v. *Peabody,* 207 Mass. 226; *Winston* v. *Pittsfield,* 221 Mass. 356; *Cavanagh* v. *Tyson, Weare & Marshall Co.* 227 Mass. 437; *McGovern* v. *Boston,* 229 Mass. 394; *Boston* v. *McGovern,* 292 Fed. Rep. 705; *Martiniello* v. *Bamel,* 255 Mass. 25. The case is plainly distinguishable from *Long* v. *Athol,* 196 Mass. 497.

It follows that the decree must be reversed and a decree entered dismissing the bill with costs.

*Ordered accordingly.*