INTERSTATE POWER COMPANY et al., Plaintiffs, Appellees, v.
FOREST CITY et al., Defendants, Appellants, B. J. PERRY
et al., Intervenors, Appellees, BUSCH-SULZER BROS.
DIESEL ENGINE COMPANY et al., Intervenors,
Appellants.

No. 43960.

AUGUST 5, 1938.

REHEARING DENIED SEPTEMBER 30, 1938.

Stipp, Perry, Bannister & Starzinger, Tom Boynton, and R. C. Brown, for appellants and intervenors-appellants L. A. Kepp and Busch-Sulzer Bros. Diesel Engine Co.

Thompson & Weible, G. E. Osmundson, Smith & O'Connor, and J. Wentworth Perkins, for appellees.

492

W. H. Salisbury and H. R. Duncan, for intervenors-appellees.

L. A. Jensen and A. J. Hill, for intervenor Bert H. Kloster.

ANDERSON, J.—The nature of the action is as stated in the preceding preliminary statement. The appellees contending, (1) that the special election for the establishment of a municipal electric plant did not carry by a sufficient majority; (2) that the voters were fraudulently induced to vote in favor of the establishment of the electric plant; (3) that the construction contracts were invalid because there was a substantial variance between the plans and specifications submitted to the voters, resulting in noncompetitive bidding; (4) that the form of ballot used at the election was misleading; and (5) that the construction contracts did not specify the maximum rate to be charged the municipality as a consumer of electric current; and that these matters constituted legal and constructive fraud sufficient to avoid the contracts.

The defense interposed to the contentions of the appellees was in effect a general denial.

The trial court expressly found "that all of the proceedings preceding the special election called for the purpose of authorizing the building of such plant, including also the election itself, fully complied with the law in such case made and provided, and that same are legal and valid in all respects. The court further finds all other issues raised by the pleadings of the several parties herein adversely to plaintiffs and intervenors joining with them, and finds such issues in favor of the city of Forest City, Iowa, and intervenors joining with them."

The trial court further found, (1) that there were substantial discrepancies between the specifications and plans submitted to the bidders; (2) and that the contracts for the construction of the plant do not include the maximum rate to be charged the municipality as a consumer of electricity, and by reason of these two matters permanently enjoined and restrained the appellants, contracting construction companies, from in any manner performing the existing contracts. As we have indicated, both parties have appealed.

There is no controversy as to the facts. The proposition as to the establishment and construction of a municipal electric

plant and distribution system was initiated in May, 1936, by the presentation to the city council of Forest City of a petition signed by a sufficient number of the legal electors requesting that an election be called on the proposition of establishing a municipal electric plant. Later the city council employed engineers to make preliminary survey and report in connection with the proposed plant. Such engineers later made and filed such report and survey. A special election was called and held and the proposition submitted to the electors in the following form:

"Shall the following public measure be adopted; shall the city of Forest City, Iowa, establish, erect, maintain, and operate an electric light and power plant with all the necessary poles, wires, machinery, apparatus and other requisites for such plant, the cost of construction thereof not to exceed the sum of $165,000.00 to be paid solely and only out of the earnings of said plant without the incurring of any indebtedness therefor by said city of Forest City, Iowa."

At the election 538 votes were cast for and 437 against the submitted proposition.

Following such election plans and specifications and a proposed form of contract were prepared and filed with the city clerk and notice of hearing thereon was published. After some interruptions, due to action of the appellees which is not necessary to detail, a public hearing was held in March and no objections having been made to the plans, specifications, and form of contract, the same were adopted by the city council. Twelve bids for the construction of the plant were received as per a published notice, and contracts for the construction of the plant were entered into by the city with Busch-Sulzer Bros. Diesel Engine Company and L. A. Kepp Contracting Company for the aggregate sum of $150,730; the said two contracts together comprising the entire electrical generating and distribution system outlined in the plans and specifications.

For several years last past the Interstate Power Company, plaintiff, appellee, has been furnishing the city and its inhabitants with electric current but its franchise has expired and, prior to the election on the proposition of establishing a municipal plant, the voters of the city had rejected a proposition to renew the franchise with the utility company. The utility company owns and operates a steam powered electric plant with a

maximum capacity of 365 K. W. H. It has also connection with a high power transmission line.

We will attempt to take up in the order above stated the various contentions of the appellees. ·

█ (1) Appellees contend that the election did not carry by a sufficient majority for the reason that the issuance of revenue bonds was contemplated, and that under section 1171-d4 it was necessary that the proposition carry by a sixty per cent majority. It probably is fair to state that since the trial of this case below, this court has determined the proposition here mentioned adversely to the contention of the plaintiffs, appellees, in the cases of Keokuk Waterworks Co. v. City of Keokuk, 224 Iowa 718, 277 N. W. 291, and Abbott v. Iowa City, 224 Iowa 698, 277 N. W. 437.

In the Iowa City case, supra, we held, speaking through Justice Kintzinger, that [page 715] :

"Appellants also contend that the election was invalid because it was not carried by an affirmative vote of sixty per cent as required by section 1171-d4 of the Code. The record in this case shows that the proposition to establish a municipal plant was carried by a majority of those voting at the election. As this is all that is required by section 6131 of the Code, appellants' contention is not well founded. Section 6131, Code of 1931, authorizes the establishment, construction, or acquisition of a municipal plant when a majority of the electors voting at the election vote in favor of the municipal plant.

"We have also ruled upon this point in the case of Keokuk Water Works Co. et al. v. City of Keokuk et al., supra, 224 Iowa 718, 277 N. W. 291. In that case we held that elections under the Simmer law are controlled by chapter 312 (§6127 et seq.) of the Code, and that the requirements of chapter 319 (§6238 et seq.) are not applicable."

As this question was fully discussed and considered in the two cases cited, we deem it unnecessary to further consider it in this opinion, and are constrained to hold that there is no merit in appellees' position on this proposition.

█ (2) Appellees further contend that the proposition as submitted to the electors was fraudulent and based on misrepresentation as to the practicability and adequacy of the proposed

plan, and that to adopt same was an abuse of discretion by the city officials.

Much of appellees' argument on the above proposition seems to be based upon the alleged fact that the appellant Power Company has at all times rendered service to the defendant City nearly one hundred per cent perfect, reciting the fact that the service had not been interrupted for any appreciable length of time since 1933; that there had been no objections or complaints from the City or from individuals as to the service or the rates charged, and that the City never has proposed reduction of the rates. The appellees state in their extended argument along this line that "The record shows without contradiction that the existing plant which has served the community for a long time has rendered service concerning which there has never been a complaint, neither as to the service or the charge made therefor; and when the local manager learned of the movement for the establishment of a municipally owned plant and went direct to the council no complaint was offered or suggested by the council or anyone else. The movement originated not in dissention on the part of anyone. The storm broke out of a clear sky. There was no evidence that the people were up in arms against the Company." We can see no argument in such statements. The statute provides for the establishment and construction of municipally owned utility plants and, if the provisions of such statutes are fairly and honestly followed by the municipality, the fact that the establishment of such a plant necessarily substitutes its services for the service of a privately owned utility, is certainly not a convincing argument against the establishment of a municipally owned utility. And neither is the fact that the privately owned utility has and is furnishing adequate and satisfactory service a convincing argument against the establishment of a municipal plant. A privately owned plant must have authority to render its service and to occupy the streets and public grounds of the city, and such authority must be granted by a majority vote of the electors. In the present case the franchise of the plaintiff Company in the defendant City has expired and a majority of the electors of the city refused to renew or extend such franchise at a special election held in January 1937. The principal argument of the appellees under this division, however, is that the proposed plant cannot be built for the amount authorized by

the electors, and that if constructed it will be inadequate to serve the needs of the City. In reaching the conclusion that the proposed plant cannot be constructed at a cost within the authorized amount the appellees add to the existing contract price of $150,730, the cost of additional or omitted items aggregating $2,158, and some other items, which we do not think should be included as part of the construction or expenditure cost. For instance, the appellees' experts add or include $2,000 for storeroom supplies and $2,100 for an item designated as "necessary working capacity". But, including all of the items suggested by appellees, their statement shows the total cost of construction would be $165,000, and the appellants' statement of the entire cost, including extras, omissions, engineer fees, building site, etc., amounts to $163,178.

We have carefully considered and computed the various estimates included in the record and are satisfied that the proposed plant can be constructed with an expenditure well within the amount authorized by the electors.

The further contention of appellees that the proposed plant is inadequate in capacity, we do not think is sustained by the record. The plan provides for the installation of three units of 250 kw., 200 kw., and 150 kw., respectively, or a total capacity of 600 kw. The record shows that from 250 kw. to 300 kw. is a sufficient capacity to supply the demands of the appellant City and its inhabitants. The record shows that during the year 1936 there were only five hours in the entire year that the demand exceeded 300 kw.; that only during 200 hours of the entire year did the demand exceed 250 kw., and that only one hour during the year was there a load of 374 kw. As we have indicated, the total capacity of the proposed plant is 600 kw., but the appellees contend in computing the capacity of the plant the largest generating unit of 250 kw. must not be considered, and that that unit should be held in reserve to meet contingencies. This upon some technical theory that we cannot conclude is practical. It certainly would be impracticable to require the large expenditure of funds that would be necessary to supply a fourth unit to be held strictly in reserve and probably not put in service at all.

The appellees also contend under this division that the proposed plan of financing is impracticable for the reason principally that no reserve for depreciation or replacement is pro-

vided for. The appellees concede that there is no statutory authority requiring that such a reserve be set up. And in the the case of Iowa Southern Utilities Co. v. Cassill, Mayor et al., 8 Cir., 69 Fed. 2d 703, it was held that the term net earnings under the Simmer law does not require a deduction for a reserve. The argument of appellees in this regard maintains that it was necessary for the engineer to omit this item of reserve in order to make a showing as to the practability and feasibility of the plan proposed to pay out within the time contemplated, and cite this as proof that there was either gross misrepresentation to the voters or that there was a gross abuse of discretion on the part of the officers of the defendant City. We cannot agree with the appellees' conclusion in this regard and agree with the finding of the trial court, ''that there had been no fraud or misrepresentation in the presentation of the proposition to the voters, and, that the plant contracted for by the City was adequate and within the scope of the proposition passed upon by the voters.'' It must be borne in mind in this connection that competent engineers were employed by the defendant City to make a preliminary report and survey and also to prepare plans and specifications for the construction of the plant in question.

 There is no question raised as to the honesty and fairness of the engineers employed and, under well established rules, the motives of the city officials are not proper subjects of 'judicial inquiry in an action of this kind especially when the means adopted for the submission of the question to the people conform to the requirements of law. Detroit Railway v. Detroit, 255 U. S. 171, 41 S. Ct. 285, 65 L. Ed. 570; Keokuk Water Works Co. v. City of Keokuk, supra; West Missouri Power Co. v. City of Washington, 10 Cir., 80 Fed. 2d 420; Epping v. City of Columbus, 117 Ga. 263, 43 S. E. 803, 808; Eastern Shore Public Service Co. v. Town of Seaford, Del. Ch. 187 Atl. 115.

The question as to whether the defendant City should have a municipal plant has been decided affirmatively by the voters. And as we must find on the record that there was no fraud or misrepresentation in the submission of the proposition, and that the plant can be constructed within the expenditure authorized by the voters, and that it will adequately serve the City and its inhabitants, we must conclude against the contention of the appellees under this division.

498

■ The next proposition is that the court erred in holding that there was a sufficient variance between the plans and specifications for the improvement to result in a failure of competitive bidding. The appellees, of course, contend that the ruling of the trial court on this proposition is supported by the record and should be sustained on this appeal.

The appellees contend, and the record apparently sustains such contention, that the plans called for transformer capacity of 729½ kva., and the specifications provide for 551½ kva., a difference of 178 kva., making a difference in price of $1,800. This is conceded by the appellants. There is also a difference of five street lights. The plans providing for 107 and the specifications for 102; this item amounts to $50. There is also an apparent variation between the plans and specifications in the amount of wire necessary for the construction of the distribution system, and the appellees' experts compute the value of the difference at approximately $560. There is a dispute, however, between the experts as to this item. The engineer who prepared the plans and specifications claims that the difference in the amount of wire necessary occurs from the fact that the wire shown in the drawings is considered flat, that is, lying on the ground without any allowance for sag or wastage and ties, and that this difference would account for additional amount of approximately $560 in the wire item, but the engineer who prepared the plans, as well as one of the engineers of the appellees, says that a five per cent allowance for sag, tie wires and wastage is necessary from a practical standpoint in accordance with engineering practice, and that a contractor in figuring the amount of wire makes allowance based upon the additional wire necessary to provide for the sag, wastage, and the tie wires.

(3) The specifications and contracts provide for lump sum bids and also for unit bids or prices by the contractors. The language of the specifications in reference to this is as follows:

"Contractor shall bid a lump sum for all labor, material and equipment necessary for the complete installation of the distribution system in accordance with these specifications and the plans, and shall also bid unit prices for additions and deductions on the items called for in the form of proposal.

"Contractor shall use the following quantities in computing his lump sum bid. Adjustments will be made in the compensa-

tion due the Contractor if the final quantities depart from the ones listed below. Such adjustments will be made on the basis of the unit prices. * * *

"Unit prices for additions or deductions from the quantities called for in the specifications. Items to be complete with all labor and material in accordance with the typical construction details referred to below."

Concededly, there was a variation or difference between the plans and the quantities estimated in the specifications and in the proposal for bids in the item of transformers. Such difference being approximately 178 kva., or a difference in money of approximately $1,800. But this did not and could not be construed as a misrepresentation or as such an error as would confuse or mislead the bidders. The bids, following the specifications, were necessarily based upon the estimated quantities of the various items, including the transformer units, and the provision in the specifications requiring unit prices for the various items was for the express purpose of taking care of errors, omissions, or changes in the amounts of the various items. The specifications provide that adjustment should be made in the compensation due the contractor if the final quantities depart from the estimated quantities, and that such adjustment and payments shall be made on the basis of the unit prices; and these provisions are for the purpose of meeting the contingency here presented. There would be no other purpose in requiring the submission by the bidders of unit prices. This method of bidding is in quite common usage in the letting of public contracts, and it seems to be generally held that the purpose of submitting a list of estimated quantities upon which the bidders are to compute their lump sum bids, is to provide a common basis for a comparison of bids. The estimated quanities would have no other function than the furnishing of a basis for the uniform comparison of bids, and such estimated quantities are not intended or treated by bidders as specifiactions for the exact quantities to be furnished. City of Mobile v. Shea, 5 Cir., 127 Fed. 521; O'Reilly v. City of Cambridge, 6 Cir., 279 Fed. 961; Kennedy v. City of Boston, 286 Mass. 148, 189 N. E. 809.

We are of the opinion that the trial court erred in holding that there was such a variance between the plans and specifications for the improvement as to result in a failure of competi-

tive bidding, and that by reason thereof no valid contract could result. There must be a reversal upon this proposition.

(4). The next question is as to whether the form of the proposition contained on the election ballot complied with the requirements of law. The trial court held that it did and the appellees do not argue the proposition on this appeal. We have carefully considered the form of ballot as submitted and, under our prior holdings, are satisfied that the trial court was right in holding that the ballot sufficiently complied with the requirements of law. Hogan v. Corning, 217 Iowa 504, 250 N. W. 134; Greaves v. City of Villisca, 217 Iowa 590, 251 N. W. 766; Wyatt v. Town of Manning, 217 Iowa 929, 250 N. W. 141.

The next proposition for which the appellants contend is that the court erred in holding that the contracts for the construction of the municipal electric plant were void because they did not contain the maximum rate for electricity to be used by the municipality.

(5). The appellees contend that the provisions of Code section 6134-d2 providing that the contract shall specify the maximum rate that may be charged the consumer, including the municipality, should govern in the construction of the contract in the instant case. While the appellants claim that such section has nothing to do and no place in the construction contract where the contract price is to be paid in cash from the proceeds of revenue bonds as provided in section 6134-f1, and that section 6134-d2 applies in the event that the contract price shall be paid out of future earnings of the plant and secured by the pledge of such future earnings. The appellants further contend that the contracts did include the maximium rate applicable to all consumers, including the municipality.

The purpose of the Simmer Law was to give to the municipalities the power to pay for utility plants out of the earnings of the plant. Prior to the adoption of the Simmer Law cities could establish and construct utility plants only by the issuance of general obligation bonds supported by a tax levy. The Simmer Law provided that such plants might be established and that the cost thereof could be paid out of the future earnings of the plant and should not become a general obligation of the municipality.

Section 6134-d2, above referred to, also provides that the contract shall specify the rate of interest to be charged. And

we had this provision under consideration in the recent case of Keokuk Water Works Co. v. City of Keokuk. In that case we held that where the proposal is to issue and sell revenue bonds and pay the contractor in cash the provision as to the rate of interest ceases to be of any import because the contractor in such event is not interested in the rate of interest for which the bonds may provide. And the same thing is true as to the inclusion of the maximum rate that may be charged the consumer. This provision has no place in a construction contract that provides for the payment of the contractor in cash. The contractor is not interested either in the rate of interest to be paid upon the revenue bonds or in the rate to be charged the consumers of electrical energy. No doubt the maximum rate to be charged consumers, as well as the interest rate for which the bonds will provide, are essential parts of a financing contract, that is, a contract, resolution, or ordinance providing for the issuance and sale of the revenue bonds.

We are constrained to hold that the trial court was in error in holding that the maximum rate as included in the contracts was insufficient, and that the construction contracts should have contained such maximum rate in order to be valid under the law.

It necessarily follows from the foregoing discussion that the case must be reversed on appellants' appeal and affirmed on appellees' appeal, and it is so ordered.—Reversed on appellants' appeal and affirmed on appellees' appeal.

KINTZINGER, DONEGAN, HAMILTON, RICHARDS, and STIGER, JJ., concur.