C. W. PENNINGTON et al., Appellants, v. TOWN OF SUMNER et al., Appellees.

No. 43062.

1006

DECEMBER 15, 1936.

Smith & O'Connor, Sager & Sweet, and J. P. Murphy, for appellants.

William L. Hassett, Poppenhusen, Johnston, Thompson & Raymond, and Wm. R. McClure, for appellees.

DONEGAN, J.—An appeal in a case, which apparently involved the same parties as in this case, was before this court hitherto, and the opinion in that case may be found in 217 Iowa 1117, 253 N. W. 60. Following the decision in that case the town of Sumner called a new election, at which it again submitted to the electors the proposition of the establishment of a municipal light and power plant. A majority of the votes at such election were in favor of such proposition, and thereafter the town called for bids and entered into a contract with Fairbanks-Morse Construction Company for the erection of such plant.

This action in equity was brought by the plaintiffs as citizens, property owners, taxpayers and users of electric current in the town of Sumner, Iowa, against the said town, the mayor, clerk and councilmen thereof, and Fairbanks-Morse Construction Company, a corporation, as defendants, asking that the defendants be restrained from carrying out the contract thus entered into. Following the trial of the case the trial court entered a decree dismissing the petition at plaintiffs' costs. From this decree the plaintiffs appeal.

The appellants have set out and argued five separate propositions upon which they rely for a reversal of the decree entered by the trial court. We shall consider these propositions in the order followed in appellants' brief and argument.

■■■ I. The first proposition presented by the appellants is, —that the ballot used at the election did not comply with the mandatory provisions of sections 761 to 763 of the 1931 Code of Iowa. Under the provisions of these statutes, and cases construing them, it has been held that the measure to be voted upon must be printed in full upon the ballot, and this was not done in the instant case. The cases so holding, however, were prior to the adoption of chapter 158 of the Acts of the Forty-fourth General Assembly (commonly known as the Simmer law), which appears in the Code of 1931 as section 6134-d1 to section 6134-d7, inclusive. In the case of Hogan v. City of Corning, 217 Iowa

504, 250 N. W. 134, it was claimed that the ballot did not conform to the requirements of sections 761 to 763 of the Code, because the measure to be voted on was not printed in full thereon, but this court held that the election and ballot therein involved 'came under the provisions of section 6134-d1 to section 6134-d7 (the Simmer law), and that this law does not require the printing upon the ballot in full the measure to be voted upon. The holding in the Hogan case has been followed and approved in Greaves v. City of Villisca, 217 Iowa 590, 251 N. W. 766; Wyatt v. Town of Manning, 217 Iowa 929, 250 N. W. 141; Pennington v. Fairbanks, Morse & Co., 217 Iowa 1117, 253 N. W. 60.

■■■ It is contended, however, that, even though it be not required, under the Simmer law, that the public measure to be voted upon be set out in full upon the ballot, still the ballot employed in the instant case was insufficient, because the proposition set out thereon failed to advise the voter as to what kind of a light and power plant the town was asking its voters to grant it the authority to erect. The proposition printed upon the ballot was:

"Shall the Town of Sumner, Bremer County, Iowa, establish, erect and construct a municipal light and power plant at a cost of not to exceed the sum of $115,000.00 to be paid out of the earnings of said plant."

It will be noted that the ballot thus referred only to "a municipal light and power plant", without describing the kind of power or energy such plant was to produce. It must be conceded that, in the cases above referred to, the proposition printed on the ballot did state the kind of energy that the plant would produce. Appellants contend that the Simmer law applies to gas and water plants or works, as well as to heat, light and power plants, and that the ballot here involved was, therefore, insufficient, because it did not inform the voter as to what kind of energy was to be employed in producing the light and power in the plant which the town was seeking the authority to erect.

The case of Hogan v. City of Corning, 217 Iowa 504, 250 N. W. 134, established very definitely that, where an election is held under the provisions of the Simmer law, the proposition to be stated upon the ballot does not have to set out in detail the contract which the municipality will enter into with the successful bidder. The holding in this case was followed and applied in

the Wyatt case and Greaves case, cited above, and the effect of these cases was to confine the requirements of the statement on the ballot to those set out in section 6134-d3 of the Code. In the case of Pennington v. Fairbanks, Morse & Co., 217 Iowa 1117, 253 N. W. 60, however, this court held that the statement of the proposition to be voted upon, which was contained on the ballot, should inform the voter whether the plant was to be established under the provisions of the general law, which would impose a liability upon the municipality, or whether it was to be established under the provisions of the Simmer law, without any obligation upon the part of the municipality to pay for it otherwise than out of earnings of the plant itself. It is not questioned that the proposition contained on the ballot in the instant case would apprise the voter that the plant was to be paid for out of its earnings, so that this question is not here involved. The Wyatt case and Greaves case hold that the ballot must comply with the provisions of section 6134-d3, which require the proposition to be submitted to an election and that, "such proposition when submitted to an election shall state the maximum amount which may be expended for the establishment, construction, or acquisition of such plant." We think, therefore, that it may be said that the requirements of this statute are that the proposition stated on the ballot must show: (1) That it has reference to a plant to be paid for out of earnings; (2) the maximum amount to be expended; (3) the kind of plant for which the money is to be expended.

Does the fact that the proposition stated upon the ballot involved in the instant case merely states that it is to "establish, erect and construct a municipal light and power plant" fail to give the voter sufficient knowledge as to the nature of the plant for which the money is to be spent? Or, does the failure to describe the plant as "an *electric* municipal light and power plant" constitute a fatal defect? The statute, section 6134-d3, provides that the proposition submitted to an election "shall state the maximum amount which may be expended for the establishment, construction, or acquisition of such plant." There is nothing in the language of the statute which prescribes specifically how the plant which it is proposed to establish shall be described. It would seem, therefore, that, if the nature of the plant which it is proposed to establish is so stated on the ballot that the voters would not have been subjected to any confusion,

but would readily have understood what kind of a plant the city was seeking authority to establish, such statement would be sufficient. The election here involved was held on the 3d day of May 1934. While it may be barely possible that light and power for a municipality might be furnished by a plant using gas instead of electricity, we doubt if there is in this entire country such a light and power plant; and we do not think it possible that any person who voted upon the proposition involved in this case had any thought that he was voting to authorize the city to establish any other kind of a light and power plant except one in which the energy used would be furnished by electricity. To hold the ballot fatally defective because it failed to describe the plant as ''an *electric* municipal light and power plant'' would, in our opinion, be to resort to an extremely strained and technical construction and would lead to absurdity. We, therefore, hold that the proposition stated upon the ballot was not insufficient because of its failure to describe the plant as an electric municipal light and power plant.

■■■ II. The second proposition relied upon by appellants is, that the law known as the Simmer law, as contained in Code sections 6134-d1 to 6134-d7, is void: (1) because it is in violation of section 6, Article I, of the Constitution of Iowa; and (2) because it is contradictory and unworkable.

Section 6, Article I, of the Constitution of Iowa, is as follows:

''All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.''

It is claimed that the so-called Simmer law violates this provision of the Constitution, because it attempts to give to municipal corporations, in their proprietary capacity, different rights and powers, with regard to rates to be charged by public utilities owned by them, than the rights and powers which are possessed by privately owned utilities. The particular difference which it is claimed arises from the provisions of this law, in regard to rates, is that public utilities owned by a municipal corporation are authorized to fix rates and charges which will net a sufficient profit to enable a municipality to pay off the original cost of the plant, plus interest, entirely out of net profits; whereas, pri-

vately owned utility plants are allowed to make such rates and charges only as will produce a fair return on the reasonable value of the property used in rendering the service. It may be conceded, as urged by the appellants, that a municipal corpora- tion engaged in owning or operating a public utility is not exer- cising a governmental function, but is acting in its proprietary capacity in the conduct of a private business. We do not think it follows therefrom, however, that a classification of owners and operators of public utilities, which divides the owners of such utilities into municipal or publicly owned corporations, and those privately owned, is necessarily a violation of the constitu- tional provision referred to. Appellants cite a great many cases and argue at length upon this proposition, but the cases cited by them do not go to the precise point here under consideration, and they are not such that the result contended for by appellants must necessarily follow. In this state we have a classification of municipalities which recognizes cities under the manager form of government, cities under the commission form of government, cities under special charter, cities under the general law com- prising cities of the first class and cities of the second class, and towns. Laws made applicable to some and not to others of these various classes have been held to be valid and not in violation of the constitutional prohibition. The so-called Simmer law is made applicable to all cities and towns in this state, and there is noth- ing in this law that specifically states that such cities and towns shall have greater rights and powers with regard to charges and rates to be charged for the products furnished by them than are possessed by privately owned utilities. The contention here made is, that the law contemplates that the plant may be paid for out of earnings and for this purpose provides that "such contract shall specify the maximum rate that may be charged the con- sumers, including the municipality, and the city shall not in- crease or fix any rate beyond such maximum." It is contended that as privately owned utilities are confined to charges which will produce only a fair rate on the reasonable value of the property used in rendering the service they are discriminated against in the matter of rates and charges, because the cities and towns establishing plants under the Simmer law may charge rates that would not only produce a fair return upon the reason- able value of the property used in rendering the service, but rates such that they will produce a sufficient return to pay for

the property itself, together with interest on the deferred payments.

In the first place, even if the municipalities be without power to fix rates on any other basis than that imposed on privately owned public utilities, we do not think the appellants have shown themselves entitled to the relief asked in this case. The Simmer law, it is true, provides that the contract shall specify a maximum rate that may be charged to consumers, including the municipality, and the contract which the town entered into did fix a maximum rate, but no showing has been made herein as to the reasonableness of these rates. Even if the rate adopted in the contract as the maximum rate should be higher than would be sufficient to produce a fair return on the reasonable value of the property used in rendering the service, we cannot assume at this time that the rights of consumers, and of other parties that might be involved, would not be protected, when the reasonableness of such rates was submitted to the court in a proper action. Moreover, we cannot assume that the operation of the plant by the municipality might not be conducted with such efficiency and with the practice of such economies that the plant would not necessarily have to charge greater rates than a privately owned utility would be entitled to charge, and that the savings thus made would not be sufficient to make the payments upon the plant and interest as provided in the contract.

But, over and above all these considerations, we think the only authority which can be said to be applicable to the point here at issue is against the contention of the appellants. In the case of Springfield Gas & Electric Company v. City of Springfield, 292 Ill. 236, 126 N. E. 739, 744, 18 A. L. R. 929, the plaintiff company was the owner of an electric plant in the city of Springfield. The city of Springfield also owned and operated an electric plant of its own and produced electricity not only for its own use but for sale to private consumers. In 1913 the legislature of the state of Illinois passed what was known as the Public Utilities Act (Laws Ill. 1913, p. 459), which, among other things, provided for a public utilities commission having power to fix rates and otherwise regulate privately owned public utilities. About the same time, and, as it appears, as a part of the same plan, the legislature also passed an act known as the Municipal Ownership Act (Smith-Hurd Ill. Stats. ch. 111⅔, sec. 96 et seq.), under which the cities of the state were given power to

acquire, conduct, own and operate public utilities, and to sell the service thereof to the city or its inhabitants, and to fix rates and charges for services rendered, but were not required to comply with certain provisions of the Public Utilities Act. This act also provided that ''the charges for the service rendered by means of any public utility of any city shall be high enough to produce a revenue sufficient to bear all costs of maintenance and operation, *to meet interest charges on bonds and certificates issued on account thereof, and to permit the accumulation of a surplus or sinking fund that shall be sufficient to meet all outstanding bonds or certificates at maturity.''* Smith-Hurd Ill. Stats., ch. 111⅔, sec. 107. (Italics are ours.) The Public Utilities Act (Laws 1913, p. 478, sec. 35) provided that no public utility should undertake to perform any service or to furnish any product· or commodity unless and until the rates and other charges and classifications, rules and regulations relating thereto, applicable to such service, product or commodity, have been filed and published in accordance with the provisions of the act. The plaintiff company filed its bill for an injunction against the city of Springfield, alleging that the city had failed to comply with these provisions of the act and should be enjoined from producing or selling electricity to private consumers. Among other things, it was contended that the Municipal Ownership Act was invalid, because it attempted to exempt municipally owned public utilities from the requirements imposed upon privately owned public utilities, contrary to the provisions of the Constitution of the state of Illinois prohibiting local or special legislation, and in violation of the 14th Amendment to the Federal Constitution. The trial court refused to grant an injunction and, in the course of its opinion sustaining this ruling, the supreme court of Illinois said:

''Municipalities, under the Municipal Ownership Act, are limited in rates and charges for the product furnished by their public utilities, and cannot operate them at a profit to the same extent as can private corporations, associations, or persons owning like utilities. They are required, under the act governing them, to keep separate accounts of the moneys received from the operation of their utilities, and such funds cannot be used as revenues except to discharge their obligations and expenses in the operation of the utilities. Their charges for such services are

1014

simply to be high enough to produce revenue sufficient to bear all costs of maintenance and operation, *to meet interest charges on bonds and certificates issued on account thereof, and to permit the accumulation of a surplus or sinking fund sufficient to meet all outstanding bonds or certificates at maturity*, issued on account of such utilities. The statute does not contemplate that the rates shall be higher or lower than for the purposes aforesaid, *no matter what effect such rates and charges may have upon other corporations or persons owning or operating public utilities.* * * *

"The right to fix rates for all public utilities is vested, in the first instance, in the state. The state has the right to prescribe rates and charges by private corporations and persons for the operation of public utilities that shall produce a reasonable profit or return over and above and on their entire investment and outlay, and, on the other hand, to limit the rates and charges of utilities owned by municipalities so that they will only be sufficient to meet outlays and expenses of every kind by reason of their ownership and operation, as provided by the Municipal Ownership Act. It is contemplated that private corporations and persons shall realize profits. *The legislature had the right to assume that the rates and charges of each of these two classes of public utilities would not and could not be the same to consumers.* It is clear, therefore, that the legislature acted within its constitutional rights and powers in enacting the two statutes and making different provisions in so far as the same were necessary to accomplish the purposes for which the two acts were enacted. It is equally clear that the legislature had the right and power to delegate to the municipalities the right of regulation and control of such municipally owned plants. Such right is clearly recognized not only in this state, but in other states. It might have given the public utilities commission the right to fix the rates and charges of plants owned by municipalities, in accordance with the provisions of the Municipal Ownership Act, as well as the right to regulate and fix charges for privately owned public utilities under the Public Utilities Act, had it seen fit to do so. The fact that it has designated municipalities as the proper bodies that shall regulate and fix the rates to be charged by utilities owned by them can furnish no cause for complaint to appellant, *as the rates that appellant may charge under the Public Utilities Act are necessarily fixed upon a different basis, and may or may not be the same as the rates and charges that may be*

*fixed under the Municipal Ownership Act, even in the same city.''* (Italics are ours.)

The case was taken to the supreme court of the United States by the plaintiff-appellant on a writ of error and was there affirmed. See 257 U. S. 66, 42 S. Ct. 24, 25, 66 L. Ed. 131. In the course of the opinion, which was written by Mr. Justice Holmes, the supreme court of the United·States said:

''The plaintiff's argument, shortly stated, is that, in selling electricity, the city stands like any other party engaged in a commercial enterprise, and that to leave it free in the matter of charges while the plaintiff is subject to the public utilities board is to deny to the plaintiff the equal protection of the laws. *But we agree with the supreme court of the state that the difference between the two types of corporation warrants the different treatment that they have received.*

''The private corporation, whatever its public duties, is organized for private ends, and may be presumed to intend to make whatever profit the business will allow. The municipal corporation is allowed to go into the business only on the theory that thereby the public welfare will be subserved. So far as gain is an object, it is a gain to a public body, and must be used for public ends. Those who manage the work cannot lawfully make private profit their aim, as the plaintiff's directors not only may but must.'' (Italics are ours.)

█▌█ It is claimed that the statute (the Simmer law) is void, because section 6134-d2 provides that, ''Such contract [for the payment of the plant] shall not constitute a general obligation or be payable in any manner by taxation. Such contract shall specify the maximum rate that may be charged the consumers, including the municipality.'' Appellants also call attention to the provisions of the contract making it of the essence thereof that no indebtedness or other obligation shall be created or incurred which may require payment from taxation or general funds, and fixing the maximum rates to be charged for electric current used by the town for municipal or public purposes.

It is the contention of the appellants that, whereas, both the statute and the contract here involved provide that no part of the cost of the plant shall be payable by taxation, they also provide for the payment by the municipality for the electric current

used by it; that the only funds with which the municipality can pay for such current must be provided by taxation; and that both the statute and the contract entered into thereunder are, therefore, contradictory, unworkable, and void. We cannot agree with this contention of the appellants. It is quite true that section 6134-d2 provides that "such contract shall not * * * be payable in any manner by taxation." The contract referred to in this section is the contract provided for in section 6134-d1, which says that "they [cities and towns] shall have power to pay for any such plant * * * out of the future earnings and/or may contract for the payment of all or part of the cost of such plant * * * out of the future earnings from such plant." The maximum rate to be charged consumers, including the municipalities, which section 6134-d2 requires the contract to specify, contemplates a payment to be made by municipalities for a service rendered by the plant to the municipality, and does not constitute a payment on the cost of the plant. It occurs to us that the distinction between a municipality's governmental function and its private or proprietary function might have been applied more appropriately in this instance than in connection with appellants' claim that the law is unconstitutional, which we have just considered. It is true that the municipality, in acquiring and conducting the plant, is acting in its private or proprietary capacity. In purchasing electric current, however, for the lighting of its streets and buildings or for other purposes, the municipality is acting in its governmental capacity in providing for the welfare and safety of its people, and in providing buildings and places where its governmental functions may be carried on. The mere fact that the funds with which the municipality must pay for lighting its streets and public places, must be derived from taxation, does not change the fact that such funds are paid out for a service rendered to the municipality in its governmental capacity by a plant which is not owned or operated by it in such governmental capacity. The payment of these funds to the municipality, as the proprietor of the plant, is no more a payment on the plant than the payment for such service by the municipality to a privately owned plant would be a payment by taxation for the maintenance and operation or cost of construction of such privately owned plant. We find nothing contradictory or unworkable in the statute.

 III. It is next contended by appellants that the appel-

lees failed in material respects to follow the provisions of the statute. It is alleged that the contract entered into calls for an expenditure greatly in excess of the $115,000 maximum expenditure stated in the ballot and voted on at the special election. Section 6134-d3, after providing for an election to determine whether the municipality may purchase such a plant, further provides—"and such proposition when submitted to an election shall state the maximum amount which may be expended for the establishment, construction, or acquisition of such plant." It is argued that the words "maximum amount", as used in the statute, do not mean the initial cost of a completed plant, but that they mean the total amount that will be paid out by the municipality before the plant will become its property; and that to the initial contract cost of the completed plant there must be added the interest on the deferred payments. The initial cost of the completed plant, as set out in the contract entered into, was $106,000, and it must be conceded that, before the plant is paid for out of its future earnings and the title acquired by the town, the interest on the deferred payments will increase the total payments to be made out of the future earnings of the plant to more than $115,000.

We do not agree with the appellants, however, that the maximum amount to be stated in the ballot, as provided by section 6134-d3, means the total amount of all payments that will be made out of future earnings of the plant before title thereto can be acquired. As we have seen, under the holding in Hogan v. City of Corning, 217 Iowa 504, 250 N. W. 134, 135, the law contemplates that the contract to be entered into will be the product of the future, and that it cannot be printed on the ballot. While section 6134-d2 requires that the rate of interest to be charged must be stated in the contract, there is no provision requiring the rate of interest to be stated on the ballot, or to be decided upon before the contract is finally executed. The amount stated in the ballot, it is true, imposes a limitation upon the municipality in making the contract, but we do not think it imposes the limitation contended for by appellants. In the Hogan case it was also contended that the ballot should have contained a statement of many of the details of construction, of the manner of operation, of methods of accounting and manner of financing, but this court said that, "such matters, like the contract, will be products of the future."

We think the sections of the Simmer law that follow section 6134-d2, viz: section 6134-d4, in regard to notice of proposed contract, section 6134-d5, in regard to contents of notice, and especially section 6134-d6, in regard to execution of contract, clearly indicate an intention on the part of the legislature to give the municipality great latitude in deciding what proposal or bid will be accepted and form of contract adopted, in order that a large discretion may be exercised in trying to obtain the best possible bargain. Until the municipality could know what rate of interest a bidder would be willing to accept, what rates or charges for service he would insist upon having made by the municipality, the size and times of payment which he would insist upon being made, and the length of time in the future within which payments of principal and interest would have to be completed, there could be no basis of comparison between the bids that might be offered. It seems quite apparent that a bid that called for a higher rate of interest, a shorter time for completed payments, and a higher rate to be charged for service, might be in connection with a plant of considerable less value than would a bid which contained a lower rate of interest, a lower charge for service rendered, and a longer time for the completion of payments. As the municipality could not make its decision until the bids were received and all these matters weighed and determined, we think the provision of section 6134-d3, in regard to "the maximum amount which may be expended for the establishment, construction, or acquisition of such plant" was intended by the legislature to have reference to the initial cost of a completed plant, and not the total of all payments of both principal and interest to be made out of future earnings.

In this connection, and as tending to support our construction as reasonable and natural, it may not be inappropriate to remark that, while many attacks by many different parties, represented by many able and ingenious attorneys, have been made upon the Simmer law since its adoption, the instant case is the first in which the attack has been based upon the construction of section 6134-d3 for which the appellants are here contending. We might also add that the construction for which appellants contend is at variance with the construction which courts have placed upon the total amount of the indebtedness of municipalities, which they have held does not include unaccrued interest. 44 C. J. 1124; Durant v. Iowa County, (C. C.) Fed. Cas. No. 4,

189, 1 Woolworth 69; Epping v. Columbus, 117 Ga. 263, 43 S. E. 803; Stone v. Chicago, 207 Ill. 492, 69 N. E. 970.

█▌█ It is claimed that the statute was not complied with because no sufficient "proposed form of contract" was at any time on file in the office of the clerk. The proposed form of contract which was on file is said to be insufficient in form or subject matter, because it did not indicate any definite plan as to the time or times of making payment, did not contain an estimate or suggestion as to a scheme of practical payments, or as to what amounts would be payable at stated intervals; because it contained nothing as to the security to be given for deferred payments, except that they would be evidenced by pledge orders or revenue bonds; and because it contained no proposed form of contract as to any pledge, mortgage or conditional sales contract covering the plant itself. When the entire Simmer Law is construed as a whole, it evidences a clear intention on the part of the legislature that the municipality is not required to submit a proposed form of contract complete in all its details; that, while each bidder is obliged to bid in accordance with the plans and specifications prepared by the town's engineer, and in compliance with the matters set out in the proposed form of contract on file, all bids are to be accompanied by a proposed form of contract of the bidder, which may go more into details than the proposed form of contract on file. That the proposed form of contract, filed in the city clerk's office, did not provide in detail the time or times of payment and amounts thereof; that it contained nothing specific in regard to the security to be given for deferred payments, except that they were to be evidenced by pledge orders or revenue bonds; and that it did not contain a proposed form of contract in regard to pledge, mortgage, or conditional sales contract, covering the plant itself, did not, in our opinion, render it insufficient to comply with the statute. There was sufficient in the notice given, and in the proposed form of contract on file, to apprise any bidder of the fact that the entire cost of the plant was to be paid for out of its future earnings, and the matters concerning which the appellants complain, as not being stated in the proposed form of contract on file, were matters which we think the law contemplates might be decided upon by the municipality after the bids, accompanied by the bidder's proposed form of contract, should be received.

█▌█ It is also claimed that there was a material variance, as

to the trial run and test, between the requirements of the specifications and the requirements of the contract which was entered into between the defendant town and the defendant, Fairbanks-Morse Construction Company. The specifications provided for a test to be made at the completion of the plant, to cover a period of not less than three consecutive days of eight hours each, to be run in the presence of the town council and engineers or both, under such loading conditions and at such hours as the engineer might direct. The specifications further provided that, in the absence of other suitable load, a water rheostat would be furnished and connected up by the contractor. The proposal submitted by Fairbanks-Morse Construction Company followed the form of proposal filed with the city clerk, and offered to do all the work and furnish all the materials required in the construction of the plant "all in accordance with the specifications, attached hereto, and the accompanying plans as prepared by your (the town's) engineers." A letter of the Fairbanks-Morse Construction Company accompanying the proposal stated that it was submitting its proposal covering the construction of the plant "all in accordance with the plans and specifications of the engineers." In the original contract signed by the town and by Fairbanks-Morse Construction Company, however, a test was provided which did not comply with the specifications. In a supplemental contract entered into between Fairbanks-Morse Construction Company and the town, it was stated that the provision as to the test contained in the original contract occurred therein through inadvertence and oversight; that it was the true intent and purpose of the parties that in all material respects the specifications upon which proposals or bids were invited should control; and it was agreed that upon the completion of the plant the trial test should be made "all in accordance with the provisions of the town specifications" pursuant to the call for bids. As the Fairbanks-Morse Construction Company, under this supplemental contract, was in no position to profit by the variance between the plans and specifications and the statement contained in the original contract; and, as under the statement contained in the supplemental contract it cannot be assumed that it was not the intention that the provisions of the specifications should prevail in regard to the test, we see nothing in this claim as it appears in this part of the plaintiffs' argument which would require that the contract be held to be void.

IV. It is next contended by the appellants that the defendants could not plead or prove a change in the contract made after the commencement of the suit, but were bound by the facts as they stood at the time the suit was commenced. The question here raised involves the pleadings in regard to the variance between the provisions of the specifications and the provisions of the original contract signed by the town and Fairbanks-Morse Construction Company. The plaintiffs alleged this variance in their petition, which was filed July 20, 1934. The original answer, joined in by all defendants on August 1st, admitted the allegations of certain paragraphs of the petition and denied all others. The allegations as to the variance plead by plaintiffs in their petition were included in the paragraphs thus denied. On August 7, 1934, the defendant town and the defendant, Fairbanks-Morse Construction Company, executed the supplemental contract, heretofore referred to, in which it was stated that the test provided in the original contract had been inserted by inadvertence, and that it was the intention of both the town and the construction company that the test should comply with the requirements of the specifications to which the bid was directed. On August 7, 1934, the defendants filed their amendment to answer in which they set out this supplemental contract. Thereafter, the plaintiffs filed a motion to strike the amendment to the answer, on the ground that the supplemental contract plead therein was entered into after the commencement of the suit, and that said amendment to answer did not plead proper defensive matter. It is contended by the plaintiffs that at the time their petition was filed there was no valid contract existing between the town and the construction company, because of the variance between the specifications and the provisions of the written contract which had been entered into between the town and the construction company, in regard to the test, and that at the time of the commencement of the action the plaintiffs were, therefore, entitled to an injunction. They further contend that, even if it be admitted that the defendants had a right to amend their answer and set up their supplemental contract, such amendment could only be a defense to the further conduct of the case, and that the rights of the plaintiffs, at that point, to costs, could not at any rate be disturbed.

In the first place, we think that the bid or proposal submitted by the construction company was a bid to do the work in

compliance with the specifications; that the specifications, having set out a form of proposal which required the bid or proposal to contain an offer to do all the work in accordance with the specifications; the bid submitted by the construction company having been made on such form of proposal, and having been accompanied by a letter which stated that the proposal was to do all the work in accordance with the specifications; and such bid, having been filed in response to the call for bids contained in the notice; the acceptance of such bid by the town constituted a binding agreement, which could be enforced by the town, even if no formal contract was thereafter entered into. Waller v. Pritchard, 201 Iowa 1364, 202 N. W. 770; Johnston v. City of Stuart, (Iowa) 226 N. W. 164 (Not officially reported); Arnold v. City of Hudson, 215 Wis. 5, 254 N. W. 108; Garfielde v. U. S., 93 U. S. 242, 23 L. Ed. 779; Harvey v. U. S., 105 U. S. 671, 26 L. Ed. 1206; U. S. v. Purcell Envelope Co., 249 U. S. 313, 39 S. Ct. 300, 63 L. Ed. 620. The fact that the formal contract entered into later contained provisions in regard to the test, which differed from those in the specifications, did not necessarily change the contract brought into being by the bid or proposal made in response to the notice given by the town. Even if a supplemental contract had not been entered into, the town could have insisted that the provisions for a test, as contained in the original formal contract, had been inserted therein by inadvertence; that the real contract was made up of the town's call for bids and the bid or proposal of the construction company in response thereto, and the acceptance of such bid by the town. The town could have insisted upon the performance of this contract and, upon showing that the formal contract did not comply with the agreement made in the real contract, could have had such formal contract reformed. If the formal contract had been thus reformed, such reformation would not have constituted the making of a new contract, but would have been a judicial finding and declaration that, as thus reformed, the formal contract represented the real agreement between the town and the construction company. Instead of denying the claim of the town and being compelled to accept such reformation, however, the construction company agreed that the facts were as claimed by the town, that the provisions of the formal contract, as originally entered into, in regard to the test, had been inserted therein by inadvertence, and consented to the ref-

ormation. The supplemental contract expressed the real agreement of the parties and did not constitute a new agreement in regard to the test.

Considerable is said about the question of fact, and it is argued that the provision in regard to the test contained in the original formal contract was not inserted in it by inadvertence but by deliberation. Both the town and the construction company, having admitted that the provision for the test, as contained in this original formal contract, was not intended by either party and was inserted in the formal contract by inadvertence, and there being no evidence to the contrary, we cannot assume that the fact is otherwise than as stated by them, and we cannot assume that both the town and the construction company deliberately intended to evade the requirements of the law by entering into a formal contract which did not comply with the specifications, and which they would have had no right to enter into in violation of the requirements of these specifications.

As the real contract, therefore, which had been entered into between the town and the construction company was not invalid, and, as the so-called supplemental contract did not, in fact, make a new contract, but simply clarified and set out the terms of the real contract and agreement between the parties, which was in existence at the time the plaintiffs' petition was filed, we do not think the amendment to the answer plead any new defense which had come into existence after the commencement of the action. And, under the provisions of sections 11182 and 11221, we find no reason for holding that the trial court improperly overruled the plaintiffs' motion to strike the amendment to the answer. Even if this be not true, the defendants would have had the right to plead a new defense arising after the commencement of the action, under the provisions of section 11224 of the Code. As the only effect of pleading such a defense would have related to the question of costs incurred up to that time; and, as there appears to be nothing in the pleadings or facts of this case to indicate that it would not have been prosecuted upon the other issues raised by the pleadings, and no particular claim is made in regard to any erroneous action of the trial court in the assessment of costs, we find no reason for interfering with the decree of the trial court on account of the matters here argued.

V. Finally, it is contended by the plaintiffs that, because of

the variance between the specifications and the provisions of the original formal contract, in regard to the test, there was no valid contract entered into between the town and the construction company, and that these defendants had no right, on August 7, 1934, to make a material modification of the contract alleged to have been entered into, without re-advertising for bids. What we have said in the preceding divisions of this opinion indicates our view that there was a valid contract entered into between the town and the construction company at the time the construction company tendered its proposal or bid and it was accepted by the town. If, at the time this bid or proposal was received and accepted, the town had called attention to the provision for the test contained in the proposed form of contract which accompanied it, and the construction company had changed its proposed form of contract, by leaving out the test therein provided, and the construction company's proposed form of contract, with no provision for test in it, had then been executed, there could have been no question that such contract was to be performed and the test upon its completion conducted in accordance with the provisions of the specifications. If no formal contract had been entered into at the time the proposal of the construction company was accepted or until the time that the supplemental contract was executed; and if, at that time, the formal contract which was then executed was the construction company's proposed form of contract, with its provision for the test left out, there could be no question about its validity. As already stated, we cannot assume that the city deliberately attempted to enter into a contract, in violation of the specifications upon which it had called for bids, and which it had no right to enter into. We cannot find that the city intended to change the provision as to test as contained in its specifications, or that the provision in the formal contract originally entered into was not the result of mistake and inadvertence. As the original contract, as changed by the supplemental contract, expresses the real intention of the parties and was the real contract which they intended to and did enter into prior to the commencement of the action, we are unable to see how either the plaintiffs or any other interested persons could have been adversely affected, or why the town would not have the right to proceed with the contract already made instead of calling for new bids.

Appellees' motion to dismiss appeal is hereby overruled, and, as we find no reason for interfering with the decree of the trial court, it is hereby affirmed.—Affirmed.

PARSONS, C. J., and ALBERT, ANDERSON, KINTZINGER, RICHARDS, HAMILTON, and STIGER, JJ., concur.