D. G. MIEHLS, appellant, v. CITY OF INDEPENDENCE, IOWA, appellee.

No. 49367.

(Reported in 88 N.W.2d 50)

February 11, 1958.

Opinion Modified April 10, 1958.

Rehearing Denied May 9, 1958.

1024

Carleton Sias, of Waterloo, for appellant.

Robert J. Pattee, of Independence, for appellee.

Edwin B. Carpenter, of Des Moines, amicus curiae.

THOMPSON, J.—The plaintiff is the holder of five electric revenue refunding bonds of the defendant-city, each in the face amount of $1000, bearing date of November 1, 1948. Plaintiff's bonds are due by their terms on November 1, 1963. They are a part of a total of $450,000, issued by virtue of a resolution of the city, duly enacted on January 24, 1949. We shall hereinafter refer to these as the 1949 bonds. These bonds were payable $30,000 on November 1 of each of the years 1950 to 1958 inclusive, $35,000 on November 1 of each of the years 1959 to 1962 inclusive, and the remaining $40,000 on November 1, 1963. All bonds and interest had been paid as due, so that at the time of the· trial below in 1957 there remained not matured and unpaid $240,000, with interest as it accrues. Shortly before the issue of refunding bonds, of which plaintiff's securities are a part, the city had, on November 22, 1948, authorized an issue of electric revenue bonds in the amount of $450,000, hereinafter referred to as the 1948 bonds; but, because more advantageous interest rates could be obtained, these were, by agreement with the holders, taken up and the refunding issue in the same amount, of which plaintiff's bonds were a part, was authorized in their stead.

The controversy here arises from the fact that on March 18, 1957, the defendant-city by resolution of its council authorized a further issue of electric revenue bonds in the total amount of $420,000, payable as follows: $30,000 on March 1 of each of the years 1958 to 1961 inclusive; $35,000 on March 1 of each of the years 1962 to 1964 inclusive; and $65,000 on March 1 of each of the years 1965 to 1967 inclusive. Interest was $3\frac{1}{4}\%$ per annum, payable semiannually beginning on September 1,

1957. It is obvious that, although the bonds of 1957 were by their terms junior in payment to the refunding issue of which plaintiff holds a part, in fact $190,000 of the later issue would be paid before the maturity of plaintiff's bonds, from electric revenue funds which are the primary source of payment of both issues. It is this priority in fact if not by terms of which plaintiff complains. The trial court dismissed his petition for declaratory judgment in which he asked that his right to a real rather than a chimerical priority be established.

I. The issuance of revenue bonds for the purpose of building, extending and improving municipal electric plants, water or gas works and heating plants, or of purchasing existing ones, is authorized by chapter 397 of the Code of 1954. It is the so-called Simmer law. By its terms the sole source of payment of bonds issued under it is the revenue from the operation of the plants themselves, with the right to the cities to grant also a lien upon the physical properties so purchased, built, extended or improved. Such is the language of the statutes, and such is the provision of all bonds, both issued and prospective, with which we are dealing here.

The authority to issue such bonds must be found in the statute. It must be expressly granted to municipalities or arise from necessary or fair implication from powers granted; and without it there is no power to act. And in case of uncertainty as to the powers granted, all reasonable doubts are resolved against the municipality. Van Eaton v. Town of Sidney, 211 Iowa 986, 989, 990, 991, 231 N.W. 475, 476, 477, 71 A. L. R. 820, and cases cited. This means that the power to act must be exercised in accordance with the statute and cannot be extended for reasons of convenience or other supposed advantage. For a thorough discussion of the rules set forth in this paragraph see Gritton v. City of Des Moines, 247 Iowa 326, 331, 73 N.W.2d 813, 815, 816, and cases cited.

II. We have pointed out above that while the proposed bond issue of 1957 in terms was subject to the prior payment of the outstanding 1949 bonds, in fact some $190,000 of the principal of the later issue will mature and will be paid from the electric revenues first. The bonds provide that they are a contract between the city and the holders; and it goes without

elaborating that ordinarily the first issued, to payment of which the electric revenues are pledged, could not be jeopardized by or made subject to payment of later issues. The holders of the first issue would generally have the first lien upon the revenues pledged for their payment.

But the city justifies its action by referring to the terms of the issue of 1948 and the refunding issue of 1949, and the resolutions authorizing them. It should be said that, upon the trial of the case, there was expert evidence, not contradicted, that the projected revenues of the electric plant of the city will be more than sufficient to meet all payments, both of principal and interest, on both bond issues, together with the payments on a $60,000 issue of 1950 which is not directly involved here. We turn then to the provisions of the resolutions and bonds of 1948, and of 1949 which refunded and retired the 1948 issue. The provisions of the 1948 bonds and their authorizing resolution of November 22, 1948, are not important here, because the 1949 bonds and their authorizing resolution of January 24, 1949, while referring to and in terms adopting the provisions of the 1948 bonds, contain substantially the same language.

The bonds of 1949, after stating that they are not a general obligation of the city, provide that a sufficient amount of the net earnings of the electric plant after payment of operating expenses and maintenance shall be set aside in a sinking fund and pledged for the payment of the principal and interest of the bonds. The bonds also contain a certification that they are issued in full compliance with the Constitution and statutes of the State of Iowa, and "in conformity with a resolution of the Council of said City duly passed on the 24th day of January, 1949."

The sinking fund is set up by the resolution. It is provided that during the twelve months preceding November 1 of each year there shall be paid into the fund as follows: "A sum equal to 100% of the principal of all bonds maturing on or prior to November 1 next succeeding, plus a sum equal to 100% of the interest becoming due on and prior to November 1 next succeeding on all of said outstanding bonds; provided, that until there has been accumulated in such Sinking Fund as a reserve an amount equal to interest for two (2) years on the bonds then

outstanding, the amounts to be so set apart and paid shall be 110% of said principal and interest instead of 100% ; and provided also, that no further payments need be made into said Sinking Fund when and so long as the amount therein is sufficient to retire all of said bonds then outstanding and pay all interest to become due thereon prior to such retirement." It is also stipulated in the same section of the resolution: "* * * If at any time there be a failure to pay into said Sinking Fund the full amount above stipulated, then an amount equivalent to the deficiency shall be paid into said Sinking Fund from the net earnings of said plant and system as soon as available and in addition to the amount otherwise required to be so set apart and paid into said Sinking Fund."

Further in the same section of the resolution is the provision which the city feels authorizes the issuance of the 1957 bonds: "Any balance of the net earnings in excess of the payments hereinbefore specified to be made into said Sinking Fund shall be available to the City as the Council may from time to time direct, and whenever and so long as the amount in said Sinking Fund is equal to the entire amount of the interest and principal that will become due on all of the bonds outstanding, then no further payments need be made into said Sinking Fund."

The argument is that the purchasers of the bonds are given notice of the resolution by reference to it in the bonds themselves; and that the resolution in turn permits the city to use surplus revenue as the council may determine. Expert opinion being shown to be that there will be surplus revenue, the city thinks it follows that it can be used to pay principal and interest on later issued bonds. In argument, the city also refers to sections 397.38 to 397.40 inclusive. We grant that these statutes are of great importance; but they destroy rather than support the defendant's position.

III. It is well settled that a municipal bond is a contract between the corporate body issuing it and the owner; and that the statutes authorizing the issuance of the bond are themselves a part of the contract. Bennett v. Greenwalt, 226 Iowa 1113, 1135, 286 N.W. 722, 733. Section 397.10 authorizes cities or towns to issue "negotiable, interest-bearing revenue

bonds." This means that only negotiable bonds are authorized. The purchaser of the bonds is not bound to inquire as to the terms of council proceedings or resolutions preliminary to the issuance of the bonds. He has a right to rely upon the statements in the bonds that they are issued in compliance with the statutes and laws of the state, and the city may not contend otherwise. City of Evansville v. Dennett, 161 U. S. 434, 439, 16 S. Ct. 613, 616, 40 L. Ed. 760; Fairfield v. Rural Independent School District, 8 Cir., 116 F. 838, 840, 841. The important question before us is whether the statutes give the city authority to do what it is attempting here.

IV. Code section 397.38 provides that when these revenue bonds are paid, or when an adequate sinking fund has been set up, the city or town may transfer any surplus earnings "in excess of the amount required for the retirement of all bonds and interest due in the current year and the succeeding year, from any municipal * * * electric plant, for the purpose of retiring existing bonded indebtedness of said city or town which is payable by general taxation or for the purpose of making any municipal improvement authorized by law and ordered by the city council."

Section 397.39 says that any city or town which has a surplus earned from the operation of an electric plant and which has sufficient funds on hand to provide for the current year's and the succeeding year's interest and principal on any outstanding revenue bonds may, with the approval of the state comptroller, transfer such surplus earnings to any other fund of the municipality. Section 397.40 is somewhat different from 397.39, and we set it out in full:

"397.40 Exceptions. In all cities having a population of five thousand or less and in all towns, the transfer of funds as provided in sections 397.38 and 397.39 may be made without the approval of the state comptroller, on condition the amount transferred in any one fiscal year does not exceed fifty percent of the surplus in that fund at the beginning of that fiscal year, if the transfer is made upon the three-fourths vote of all the members of the council of such city or town."

■ We take judicial notice that the City of Independence has at all times material here had a population of less than 5000. First National Bank v. Anderson, 196 Iowa 587, 604, 192 N.W. 6, 13.

■ It is necessarily the city's position that, since it may, under certain conditions, use surplus revenues for other purposes, it may anticipate that there will be such revenues and pledge them for the payment of the proposed 1957 bonds. We find no authority in the statutes for such action. The excess revenues may be used, or transferred, only after it appears that they have accumulated above the amount required for the current year and succeeding year as payment of interest and maturing principal. The proposed 1957 bonds, by their terms subject to the payment of the 1949 bonds, attempt to pledge these assumed surplus earnings many years in advance. There is the testimony of the expert that there will be such earnings; but there are also the old adages about the many slips between the cup and the lip, to say nothing of counting chickens before they are hatched. Perhaps the legislature had these considerations in mind when it limited the use of the surplus earnings as it did; that is to say, to those already in hand. The language is "having a surplus earned"; not "that may be earned." In any event, and for whatever reasons, it did not authorize the anticipation of excess earnings for the payment of any part of the principal of second or third or later lien bonds prior to full payment of the first lien bonds, which is the answer to the entire controversy.

Another consideration arises from the language of section 397.40, quoted above. The provision is that in cities having a population of less than 5000, the approval of the state comptroller is not required for the transfer of earned surplus funds; but this can be done only on condition the amount transferred in any one fiscal year must not be more than fifty per cent of the surplus in the fund at the beginning of the year, and "if the transfer is made upon the three-fourths vote of all the members of the council of said city or town."

Not only does this point up the thought that these surplus funds may not be used, or pledged, until they are in hand, but it illustrates the lack of authority of a present council to bind

its successors by selecting a use of the anticipated funds which might not be in accord with the thinking of the later councils. Quite evidently the funds may not be transferred in an amount in excess of one half the surplus at the beginning of the year, which clearly refutes any claim that the council may look several years ahead and pledge the revenues; and it is equally evident that it is three fourths of the members of the council in office at the time the surplus accumulates who must vote the transfer. Section 397.40 makes the transfer a year-to-year proposition, dependent upon the approval of three fourths of the members of the then council. The need for improvements of the plant may be strong; but they must be paid for in accordance with the statutes. There is a wide distinction between the power granted in the statutes to divert excess revenues after they have accrued by action of the council then in office, and with the approval of the state comptroller, or by a vote of three fourths of the council; and the proposed pledge of supposed future surplus revenues not yet earned or certain which eliminates any voice in the matter by councils functioning when such speculative moneys are actually in hand. See Saltzman v. City of Council Bluffs, 214 Iowa 1033, 1037, 243 N.W. 161, 163, upon a somewhat similar point.

The governing rule here is expressed in Division I of this opinion, and in Gritton v. City of Des Moines and Van Eaton v. Town of Sidney, and other cases therein cited. The issuance of the proposed 1957 bonds in their present form, which is to say with their present maturity dates, is beyond any power granted by the statutes. We see no objection to the issuance of additional revenue bonds to mature following the maturity of all outstanding bonds previously issued, or where an adequate sinking fund has been provided for full payment of such outstanding bonds.

■■■ V. The city urges that since plaintiff has an adequate remedy at law he cannot maintain a declaratory-judgment action to determine his rights. It is argued that he should wait until his bonds mature; that he is not harmed until it appears upon the maturity of his bonds that they will not be paid. This is a "Wait until the damage is done" contention. It is not well founded. The purpose of a declaratory-judgment suit is to determine rights in advance. The governing rule is thus stated in

26 C. J. S., Declaratory Judgments, section 1, page 50: "* * * the essential distinction between a 'declaratory judgment action' and the usual 'action' is that no actual wrong need have been committed or loss have occurred in order to sustain the declaratory judgment action, although there must be no uncertainty that the loss will occur or that the asserted right will be invaded." We have pointed out in the preceding divisions that a substantial right will be invaded if the defendant is permitted to issue the 1957 bonds with their scheduled maturity dates.

VI. It is further urged that the plaintiff had notice of the status of his bonds and of the proposal of the city to issue the 1957 bonds when he purchased them. The 1949 bonds were negotiable; not because they were made so by fiat of the statute, but because the city was permitted by the terms of section 397.10 to issue no other kind. We have pointed out that purchasers of these bonds were not required to take notice of the terms of the council resolution authorizing them. They recited that they were issued in compliance with the statutes of the State of Iowa. Nor was the plaintiff bound to take notice that other and illegal bonds were to be issued, which would jeopardize the funds available for payment of the first issue, the 1949 bonds. If he had such notice, he still had the right to purchase the 1949 bonds, with all the rights pertaining to them. The contention at this point is without merit.

VII. Finally it is contended that plaintiff has waived his propositions relied upon for reversal by failure to argue them. The propositions are stated, with brief points set out at some length. The brief points themselves contain arguments in support of the propositions stated, with supporting authorities. While we have never defined what constitutes "arguing" errors or propositions within the meaning of R. C. P. 344(a) (4) (Third), (see Van Donselaar v. Van Donselaar, 249 Iowa 504, 508, 87 N.W.2d 311) we think the argument here is sufficient to meet the requirements of the rule.

The cause is reversed and remanded for decree in conformity with this opinion.—Reversed and remanded.

BLISS, GARFIELD, HAYS, LARSON, OLIVER, and WENNERSTRUM, JJ., concur.

PETERSON, C. J., dissents.

SMITH, J., not sitting.

PETERSON, C. J. (dissenting)—I. I respectfully dissent. There is no dispute as to the facts in this case, and they are fully and clearly stated in the majority opinion. The only question involved is one of law.

I am in disagreement with the majority opinion because it is my contention that the new bond issue can do no harm to plaintiff's bonds. His investment was not prejudiced in any manner. There was no change in his status as a bondholder, because of the terms of the resolution as to the new issue. Section 5 of the resolution with reference to the new bonds dated March 18, 1957, provides in part:

"The incomes and revenues of said plant and system shall continue to be set aside into a separate and special fund and, except as hereinafter otherwise provided, shall be used in maintaining and operating said plant and system, and after payment of the proper and necessary maintenance and operation expenses shall, to the extent provided, be used to pay the principal of and the interest on the outstanding Electric Revenue Refunding Bonds dated November 1, 1948, the outstanding Electric Revenue Bonds dated January 2, 1950, and the bonds hereby authorized. Each month after paying the proper and necessary maintenance and operation expenses, *a sufficient portion of the first available net earnings of said plant and system shall be set aside and paid into the 'Electric Revenue Bond Sinking Fund' in the amounts and in the manner and as provided in the resolution adopted January 24, 1949, to pay the interest upon and principal of the Electric Revenue Refunding Bonds dated November 1, 1948 [plaintiff's bonds], as the same become due.* * * * It is hereby represented, certified and declared that all of the required and provided transfers and payments into said sinking funds as hereinbefore referred to are current.

"There is hereby created and, so long as any of the bonds hereby authorized are outstanding, there shall be maintained a special fund to be known as the '1957 Electric Revenue Bond Sinking Fund' into which there shall be set aside each month

from the net earnings of the municipal electric light and power plant and system, *subject to the priorities in favor of the payments into the 'Electric Revenue Bond Sinking Fund' for the 1948 bonds [plaintiff's bonds] and* into the sinking fund for the 1950 bonds as hereinbefore referred to, such portion of the balance of said net earnings as will be sufficient to pay the interest on and principal of the bonds hereby authorized as the same become due, * * *:

"* * * that the bonds hereby authorized *shall be subject to existing priorities in favor of said presently outstanding bonds* and shall be payable only from the balance of the net earnings of said plant and system remaining after first setting aside the amounts required to be paid into the respective sinking funds for said outstanding bonds and which would otherwise be available to the City as directed by the City Council." (Emphasis mine.)

II.   Aside from question of prejudice as to plaintiff's bonds by issuance of the new bonds, the majority opinion seems to hold that second, third, etc., issues of revenue bonds should be stopped until all previous issues have been paid. I disagree with this theory. I do not think the Simmer Act so states, nor that the legislature ever intended such restriction. In recent years we have witnessed great growth in most of our cities and county seat towns. For proper progress it is imperative that extension of electric or water service be arranged. In many cases the plants have become antiquated and worn out, and need replacement, as in the case of Independence, and yet there may be some bonds not matured. The service may have been extended, or will be extended by the improvement, so that sufficient revenue can be anticipated to easily carry the old and new bonds.

The statute is clear: "For the purpose of defraying the *cost* of any such plant, *improvement or extension thereof,* any such city or town is hereby authorized to issue negotiable, interest-bearing revenue bonds payable from and *secured by the net earnings of the plant* * * *." Section 397.10. (Emphasis mine.)

There is nothing in this section, or the Simmer Act, prohibiting two or three bond issues if the anticipated revenue so justifies. The majority opinion reads meaning into the statute

which is not present. If the legislature intended that only one bond issue should be in effect at a time it could and would have so stated.

Section 4.2, Code 1954, provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. Its provisions and all proceedings under it shall be *liberally construed* with a view to promote its objects and assist the parties in obtaining justice." (Emphasis mine.)

In accordance with this provision we have often held that Acts of the legislature should be liberally construed. Chiesa & Co. v. City of Des Moines, 158 Iowa 343, 138 N.W. 922, 48 L. R. A., N. S., 899; Sullivan v. Harris, 224 Iowa 345, 276 N.W. 88; Tusant v. City of Des Moines, 231 Iowa 116, 300 N.W. 690; Blakeley v. Estate of Shortal, 236 Iowa 787, 20 N.W.2d 28.

III. The majority opinion presents in support of its position the principles announced in Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N.W. 475, 71 A. L. R. 820. This decision was rendered prior to enactment of the Simmer Act and pertains to general law as to power of municipalities. It can be distinguished from the case at bar. Sidney did not purchase or build an electric light plant and issue revenue bonds to secure the funds with which to pay for the plant as provided by statute. It entered into a conditional sales contract for erection of the plant, leaving the title in the seller until paid for, and issued documents known as "pledge orders" to be paid monthly from revenue, until purchase price was fully paid. The court properly held there was no statutory basis for a municipality to execute such a contract, nor to let title remain in seller until final payment. I do not find any such flagrant disregard of statute in the instant case.

IV. The primary purpose of the Simmer Act was to grant municipalities authority to issue revenue bonds to buy, build, improve or extend municipal electric or waterworks plants, and provide a program for payment of the bonds. The Act has been in effect since 1931. It has been attacked from every conceivable angle, and has been repeatedly approved by this court.

Constitutionality approved: Pennington v. Town of Sumner, 222 Iowa 1005, 270 N.W. 629, 109 A. L. R. 355; Iowa South-

ern Utilities Co. v. Cassill, 8 Cir., 69 F.2d 703. Maximum rate omitted from contract does not nullify bonds: Interstate Power Co. v. Forest City, 225 Iowa 490, 281 N.W. 207. Power of cities to adjust rates: Iowa-Nebraska Light & Power Co. v. City of Villisca, 220 Iowa 238, 261 N.W. 423. Bonds do not affect city debt limitation: Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 296 N.W. 770, 146 A. L. R. 315. City definitely authorized to pledge future earnings as security for purchase price: Greaves v. City of Villisca, 217 Iowa 590, 251 N.W. 766. Taxpayer not entitled to injunction against construction of plant, because it would be paid for out of future earnings: Iowa Public Service Co. v. Parsons, 272 N.W. 613. This is only a cross-section of decisions approving the Act. There are about ten others. The specific question involved has not heretofore been before us. It has been so obvious for more than twenty-five years that if improvements and extensions were needed, and the excess revenue could carry the load, there was no reason why more bonds should not be issued.

Almost the identical question was considered in Indiana in 1953. The second issue of bonds was approved, although the first issue had not been fully paid. Ahlborn v. City of Hammond, 232 Ind. 12, 22, 111 N.E.2d 70, 75. There is no specific statutory authority in Indiana for issuance of more than one bond issue when a previous issue is unpaid. Conversely, there is no provision against such procedure. In this respect the statutes are similar to Iowa. In the above cited case the court said:

"Section 48-5305, Burns' 1950 Replacement, authorizes the issuance and sale of bonds for the construction, alteration, and building of a waterworks system, parts thereof, additions, extensions, and betterments thereto. * * * Section 48-5319, Burns' 1950 Replacement, provides, in part, that 'the board of trustees of said water department shall be and they are hereby authorized to issue and sell bonds from time to time * * *. It is apparent from the reading of the entire act that the Legislature has not undertaken to *limit appellees to only one bond issue in effect at any given time.*" (Emphasis mine.)

V. The majority opinion emphasizes the fact that holders of negotiable revenue bonds do not need to look to resolutions of

the council as to terms of the bonds. In general this is correct, but the city is bound by any action taken in the form of resolutions. For example, whether plaintiff had knowledge of it or not when he bought the bonds, the City of Independence cannot repudiate the provisions of its resolution of March 18, 1957, establishing the priority of his bonds. 64 C. J. S., Municipal Corporations, section 1969, states: "A bona fide purchaser of municipal bonds has a right to rely on recitals in the municipal records as to matters affecting the validity of the bonds, and as against him the municipal corporation is estopped to contradict such records."

I would affirm.